Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22999213 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**

Agosta v. Inovision, Inc.
E.D.Pa.,2003.
Only the Westlaw citation is currently available.
    United States District Court,E.D. Pennsylvania.
            Maria AGOSTA, Plaintiff,
                        v.
            INOVISION, INC., Defendant.
            **No. Civ.A. 02-806.**

                Dec. 16, 2003.

James A. Francis, Mark D. Mailman, Francis &
Mailman, PC, Philadelphia, PA, for Plaintiff.
Catherine Olanich Raymond, Christie Pabarue
Mortensen & Young PC, Philadelphia, PA, Curtis
P. Cheyney, III, Swartz Campbell & Detweiler,
Philadelphia, PA, Edmund K. John, Law Office of
Edmund K. John, Malvern, PA, for Defendant.

                *MEMORANDUM OPINION*
DAVIS, J.
**\*1** Presently before this Court are Defendant
InoVision, Inc.'s Motion for Summary Judgment
(Def.'s Mot. for Summ. J., Doc. No. 26) filed on
April 14, 2003, Plaintiff's Opposition to Defendant
InoVision Inc.'s Motion for Summary Judgment
(Pl.'s Opp., Doc. No. 31) filed on May 12, 2003,
and the Reply to Plaintiff's Opposition to
Defendant's Motion for Summary Judgment (Def.'s
Reply, Doc. No 37) filed by Defendant InoVision,
Inc. on May 30, 2003. Also before this Court are
the Motion for Partial Summary Judgment (Pl.'s
Mot. for Summ. J., Doc. No. 27) filed by Plaintiff
on April 14, 2003, the Opposition to Plaintiff's
Motion for Partial Summary Judgment (Def.'s Opp.,
Doc. No. 32) filed by Defendant InoVision, Inc. on
May 14, 2003, and the Reply to Defendant
InoVision's Opposition to Plaintiff's Motion for
Partial Summary Judgment (Pl.'s Reply, Doc. No.
38) filed by Plaintiff on May 30, 3002.

I. Factual Background and Procedural History

On February 15, 2002, Maria Agosta ("Plaintiff")
filed suit against InoVision, Inc. ("InoVision"),
Equifax Credit Information, and Equifax, Inc.
(together, "Defendants") for alleged violations of
the Fair Credit Reporting Act. 15 U.S.C. § 1681, et
seq ("FCRA"), the Fair Debt Collection Practices
Act, 15 U.S.C. § 1692, et seq. ("FDCPA"), and
common law defamation, negligence and invasion
of privacy/false light, seeking recovery for "serious
financial losses, credit and dignitary harm and
emotional distress damages." *See* Pl.'s Mot. for
Summ. J. at 5. The Equifax defendants settled with
Plaintiff and the case against those defendants was
dismissed by praecipe on February 13, 2003. *See*
Pl.'s Praecipe, Doc. No. 24. Plaintiff's remaining
claims against InoVision allege that though Plaintiff
disputed the account, InoVision inaccurately
reported a charged off PECO utility account for two
years after Plaintiff no longer resided at the
apartment that had accumulated $1200 of unpaid
electricity bills. *See* Pl.'s Mot. for Summ. J. at 5.

Therefore, Plaintiff claims that InoVision violated
the FDCPA and the FCRA by reporting the
commencement of delinquency incorrectly and by
failing to indicate that Plaintiff disputed the
accuracy of the report. *See Id.* at 2. According to
Plaintiff's deposition testimony, shortly before
vacating the apartment on 626 S. 10th Street in
February 1994, she contacted PECO to terminate
the account. *See* Pl.'s Mot. for Summ. J. at Ex. B,
Agosta Dep. at 61-63. However, PECO records
indicate that Agosta's verbal request for termination
on February 14, 1994 was followed by a visit to 626
S. 10th Street by PECO technicians on February 16,
2004 at which time Plaintiff dismissed the
technicians, expressing a desire for service to
continue at that address. *See* Def. Mot. for Summ.
J., Ex. D. Until June 1996 when it terminated the
account and discontinued service, PECO continued
to provide electricity and send billing statements to
626 S. 10th Street. *Id.* NCO Financial Systems, Inc.,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 2

Not Reported in F.Supp.2d, 2003 WL 22999213 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

an independent collection agency, ("NCO") then reported the delinquency on PECO's behalf. *See* Def. Mot. for Summ. J. at Ex. F, Jenkins Dep. at 76-80; Ex. H, Maguire Aff. InoVision purchased the debt from PECO on March 24, 1998; as part of the transfer, PECO warranted the validity of the debt. *See* Def. Mot. for Summ. J., Ex. C. In 2000, when Sovereign Bank denied her application for a mortgage, Plaintiff discovered that InoVision was furnishing information of alleged delinquency on this utility service account. *See* Pl.'s Mot. for Summ. J. at Ex. B, Agosta Dep. at 42-48. Chase and Capital One also denied credit card accounts to Plaintiff after reviewing her credit report which she claims contained only one adverse entry, the PECO account.[FN1] *See* Pl.'s Mot. for Summ. J., Ex. F. Plaintiff disputed the inaccuracy of the negative data with Equifax and other credit reporting agencies, who submitted Consumer Dispute Verification forms ("CDV") to InoVision through its collection agency, NCO in October 2001. *See* Def. Mot. for Summ. J. at 4. InoVision claims that NCO later conducted an investigation as to the validity of the debt the findings of which InoVision communicated to Plaintiff. *See* Def. Mot. for Summ. J. at Ex. F, Jenkins Dep. at 71.

> FN1. InoVision notes that Plaintiff consistently made late payments to the PECO account at 1438 Snyder Avenue and was repeatedly delinquent on PECO and other accounts. *See* Def. Mot. for Summ. J. at 4. InoVision relies primarily on Plaintiff's deposition testimony and an Equifax credit report for this information and uses it to argue that the cause of future credit application denials was not solely the alleged PECO account. *Id.* at Ex. E.

**\*2** Plaintiff argues that the commencement of delinquency began in February 1994, thirty days after the last payment Plaintiff made on the account. She further argues that because the information did not appear on Plaintiff's credit report until June 1996, the derogatory information appeared on her credit report after September 2001, in excess of the seven-year (plus 180 day) period allowable under the FCRA. 15 U.S.C. § 1681c(a)-(c). InoVision

argues that in accordance with utility industry practice and Pennsylvania Utility Commission (" PUC") regulations, the "charge-off/shut-off" date qualifies as the first delinquency because it marks the date that service can be terminated regardless of payment history on the account. *See* Def. Mot. for Summ. J. at 5. Plaintiff concludes that InoVision's own admissions via deposition testimony of its corporate representative, Amelie Jenkins, reveal no issue of material fact that would preclude judgment as a matter of law due to the inaccurate, untimely, and defamatory nature of the reported information in violation of FDCPA § 1692e(8) and FCRA § 1681s-2(b). *See generally* Pl.'s Mot. for Summ. J at 3-7. InoVision argues that only when a furnisher fails to take action after receiving information from a credit reporting agency are the duties created by FCRA § 1681s-2(b) triggered, that it appropriately concluded that the information it reported was accurate, timely, and that a reinvestigation would yield the same conclusion. Finally, InoVision argues that Plaintiff fails to establish a prima facie case under the least sophisticated consumer test that it violated the FDCPA and that her claims under the FDCPA are time barred by the statute of limitations. *See generally* Def.'s Mot. for Summ. J. at 11-20. In the alternative, InoVision contends that were such a cause of action available, Plaintiff's state law claims are preempted by the FCRA *Id.*

## II. Standard of Review

Summary judgment is appropriate when "there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994). The moving party bears the burden of showing that the record discloses no genuine issues as to any material fact and that he or she is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 3

Not Reported in F.Supp.2d, 2003 WL 22999213 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

party has met its burden, the non-moving party must go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is a genuine issue for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 249. " Such affirmative evidence-regardless of whether it is direct or circumstantial-must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams v. Borough of W. Chester,* 891 F.2d 458, 460-61 (3d Cir.1989).

### III. Analysis

*3 Prompted by concerns over abuses in the credit reporting industry, Congress enacted the FCRA to " insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4) (2003); *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir.1995). Consumer reporting agencies and credit furnishers play crucial roles in collecting and transmitting consumer credit information; inaccurate information can visit detrimental effects upon both the individual customer and the national economy. *Philbin v. Trans Union Corp.* 101 F.3d 957, 962 (3d Cir.1996) *citing* 15 U.S.C. § 1681(a)(1), (3).

### A. Fair Credit Reporting Act Claims

### 1. Plaintiff May Bring A Private Right of Action Against, InoVision, A Furnisher of Information

Defendant argues that because no private right of action exists for Plaintiff against InoVision, a furnisher of information, Plaintiff's allegations that Defendant failed to meet its investigative duties under § 1681s-2(b) of the FCRA after it received notice from a credit reporting agency must be dismissed. *See* Def.'s Reply at 5. In reaching this

conclusion, Defendant points to *Jaramillo v. Experian Information Solutions, Inc.* 155 F.Supp.2d 356 (E.D.Pa.2001) in which the Court observes that Congressional intent in this regard is unclear. *See* Def. Mot. for Summ. J. at 12. Plaintiff responds by pointing specifically to *Sheffer v. Experian Information Solutions, Inc.,* 2003 WL 403171, *2 (E.D.Pa. Feb.14, 2003) which holds that a private right of action does exist against a furnisher of information. *See* Pl.'s Reply at 6, Ex. C. We agree.

While courts have reached varied conclusions as to whether a consumer has a private right of action against a credit furnisher, a majority of courts that have addressed this issue has "effectively recognized Congress' obvious intent· [to] create a private cause of action through § 1681s-2." *Sheffer v. Experian Information Solutions, Inc.,* 249 F.Supp.2d 560, 562 (E.D.Pa.2003) *citing Vazquez-Garcia v. Trans Union De P.R., Inc.,* 222 F.Supp.2d 150, 155 (D.P.R.2002); *see also Nelson v. Chase Manhattan Mortg., Corp.,* 282 F.3d 1057, 1058 (9th Cir.2002) (describing purpose of § 1681s-2(b) as "provid[ing] some private remedy to injured consumers"). "The civil liability sections, 15 U.S.C. § 1681n and 1681o, explicitly provide a private right of action for consumers wishing to enforce any provision of the Fair Credit Reporting Act against 'any person' who either 'willfully fails to comply' or is 'negligent in failing to comply." ' *DiMezza v. First USA Bank, Inc.,* 103 F.Supp.2d 1296, 1300 (D.N.M.2000). As defined by § 1681a, a "person" for purposes of the FCRA means "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity. " 15 U.S.C. § 1681a. A credit furnisher falls within this definition. [FN2] The plain language of 15 U.S.C. §§ 1681a, 1681n, 1681o, 1681s-2(b) and (c) provide a private right of action for a consumer against furnishers of information who have willfully or negligently failed to perform their duties upon notice of a dispute. *Id.; see also Angelastro v. Prudential-Bache Securities, Inc.,* 764 F.2d 939, 947 (3d Cir.1985) (noting that where the enabling statute authorizes an implied right of action, courts should permit private suits under agency rules within the scope of the enabling statute if doing so is not at variance with the purpose of the statute.);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22999213 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Nelson v. Chase Manhattan Mortgage Corp.,* 282
F.3d 1057 (9th Cir.2002)(holding that §§ 1681n and
1681o permit suit against a furnisher of credit
reporting information that violates the duties
imposed under § 1681s-2). The plain language of
the FCRA suggests that a private right of action for
consumers to enforce the investigation and
reporting duties imposed on furnishers of
information exists. *Id.*[FN3] Consistent with this
reasoning and with *Sheffer,* we conclude that §
1681s-2(b) provides Plaintiff with a private right of
action against InoVision, a furnisher of credit
information.

> FN2. In the context of the FCRA, the term
> "person" might refer to a furnisher,
> supplier, or user of credit information,
> though it usually does not refer to the
> subject of the information." *After the Deal
> is Done: Debt Collection and Credit
> Reporting,* 47 A.F.L.Rev. 89, 107 (1999).

> FN3. While it seems clear that the duties
> imposed on a credit furnisher may differ
> from those imposed upon a credit reporting
> agency, subsection 1681s-2(b) specifies
> the duties the FCRA imposes on credit
> furnishers. "The furnisher of disputed
> information has four duties: (1) to conduct
> an investigation with respect to the
> disputed information," to review all
> relevant information provided by the CRA;
> to report the results of its investigation to
> the CRA; and if the investigation finds the
> information is incomplete or inaccurate to
> report those results to the nationwide
> consumer reporting agencies to which it
> furnished the information." *Nelson v.
> Chase Manhattan Mortgage Corp.,* 282
> F.3d 1057 (9th Cir.2002).

2. Genuine Issues Of Material Fact Preclude A
Grant Of Summary Judgment With Respect to
FCRA Claim

**\*4** At the core of the dispute in this case lies the
accuracy of the debt and the adequacy of
InoVision's procedure in reporting and investigating

that debt. Where a consumer alleges defamation and
violation of the FCRA, whether the agency should
have verified the accuracy of information, whether
the agency promptly notified the consumer of
reinsertion of disputed information and provided an
adequate description of its reinvestigation
procedures, and whether the alleged defamatory
information about the consumer was published by
the agency were questions for the jury. *Cushman v.
Trans Union Corp.,* 115 F.3d 220 (3d Cir.1997).
Because issues related to the accuracy of credit
reporting are primarily factual inquiries about which
reasonable minds could differ, this Court reserves
the resolution of such questions for the jury.

*a. Commencement of Delinquency*

Plaintiff argues that the period of delinquency
should have begun thirty days after her last payment
on the 626 S. 10 Street account in January 1994.
Had the reporting commenced in February of 1994,
the derogatory information would only appear on
her credit report until September 2001.[FN4] Plaintiff
further argues that InoVision violated the FDCPA
by reporting the incorrect date of first delinquency.
[FN5] The FCRA defines when the seven years
begins to run: (1) in general, the seven-year period
referred to in paragraphs (4) and (6) of subsection
(a) of this section shall begin, with respect to any
delinquent account that is placed for collection
(internally or by referral to a third party, whichever
is earlier), charged to profit and loss, or subjected to
any similar action, upon the expiration of the
180-day period beginning on the date of the
commencement of the delinquency which
immediately preceded the collection activity, charge
to profit and loss, or similar action. *Batdorf v. Trans
Union,* 2002 U.S. Dist. LEXIS 9489 (N.D.Cal. May
13, 2002). Whether the commencement of
delinquency began in February 1994 as Plaintiff
contends, thirty days after her last payment or
whether the "charge-off/shut-off" date qualifies as
the first delinquency because it marks the date that
service can be terminated regardless of payment
history on the account depends largely on whether
Plaintiff still bore responsibility for the account.
That InoVision complied with PUC protocol does
not adequately counter Plaintiff's contention that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2003 WL 22999213 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

"charge off/shut off date should have been in February at her request. *See* Pl.'s Mot. for Summ. J. at Ex. B., Agosta Dep. at 61-63.

> FN4. Pl.'s Mot. for Summ. J. at n. 4 (Plaintiff cites to 15 U.S.C. §§ 1681c(a)-(c) which reads, in pertinent part: "Except as authorised under subsection (b) of this section, no consumer reporting agecy may make any consumer report containing any of the following items of information: (4) Accounts placed for collection or charged to profit and loss which antedate the preort by more than seven years.")

> FN5. Pl.'s Opp. at 22 (Plaintiff argues that failure to report the commencement of delinquency accurately violates § 1692e(8) of the FDCPA because InoVision, in reporting the wrong date of first delinquency of the PECO utility account knew or should have known that the debt reported was inaccurate.)

### b. *Accuracy of Reporting and Burden of Reporting Consumer Dispute*

The FCRA requires credit reporting agencies to report information that is "technically accurate." *Heupel v. Trans Union LLC,* 193 F.Supp.2d 1234, 1240-41 (N.D.Al.2002).[FN6] In *Todd,* Associated Bureau Services, Inc. ("Associated"), a credit reporting agency under the FCRA, reported in late 1975 that the plaintiffs, as of the early part of 1973, owed Hess', Inc. $1,200.00 without mentioning that the plaintiffs had paid off their debt. 451 F.Supp. at 448. The plaintiffs brought an action against Associated, alleging that the "misleading, stale and erroneous credit report distributed to various retailers by Associated rose to the level of negligent noncompliance with the Act." *Id.* at 448. The court held that the plaintiffs could not sustain their cause of action because Associated's report was accurate. *Id.* at 449. *Todd v. Associated Credit Bureau Servs., Inc.,* 451 F.Supp. 447 (E.D.Pa.1977), *aff'd,* 578 F.2d 1376 (3d Cir.1978), *cert. denied,* 439 U.S. 1068, 99 S.Ct. 834, 59 L.Ed.2d 33 (1979).

FN6. Section 1681s-2(a) begins with a flat prohibition in (1)(A) directed against "[a] person" furnishing information "relating to a consumer" to a CRA "if the person knows or consciously avoids knowing that the information is inaccurate." This prohibition is reinforced in subsection (1)(B) by a prohibition of furnishing inaccurate information after notice of actual inaccuracy from the affected consumer. Subsection (2) imposes a duty on regular furnishers of credit information to correct and update the information they provide so that the information is " complete and accurate." Subsection (3) imposes a duty on such furnishers to notify CRA's if a consumer disputes the information furnished. Subsection (4) obliges furnishers to notify the CRA of the closure of a consumer's account, and subsection (5) imposes a similar obligation to notify the CRA of delinquent accounts. *Nelson v. Chase Manhattan Mortg. Corp.,* 282 F.3d 1057, 1059 9th Cir.2002)

**\*5** Though "technically accurate," a derogatory entry on a credit report is actionable because it is misleading or materially incomplete. *Koropoulos v. Credit Bureau, Inc.,* 734 F.2d 37 (D.C.Cir.1984). In *Koropulos,* the District of Columbia Circuit Court of Appeals held that granting "summary judgment on the grounds that the information in [a credit] report was technically accurate, regardless of any confusion generated in the recipient's minds as to what it meant, [is] improper." *Id.* at 42. The court also noted that the "technical accuracy defense" is not in accord with the purpose of the FCRA. *Id.* 40-42.

Because the Third Circuit has not endorsed the " technical accuracy defense," [FN7] we shall apply the less stringent approach articulated in *Koropoulos.* Applying that approach, we find that there is a genuine issue of material fact as to whether InoVision's treatment of the PECO account was so misleading as to be inaccurate within the meaning of Section 1681e(b). A reasonable jury could find that delinquent PECO account reported in Plaintiff's credit report misled potential creditors into

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22999213 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

believing that she had indeed been delinquent despite her contention that she had not; a reasonable jury could similarly support InoVision's contention that the account did belong to Plaintiff.

> FN7. The Third Circuit affirmed *Todd* without opinion. *See* 578 F.2d 1376. Nevertheless, even if we were to adopt the *Todd* approach, there is a question of fact as to whether the PECO utility account delinquency was indeed "technically accurate." InoVision argues that the account was correctly reported, *see* Def.'s Mot. for Summ. J.at 13, whereas, Plaintiff contends that it was incorrect. *See* Pl.s's Compl., 34-7; Pl.'s Mot. for Summ. J. at 6.

### c. *Investigation Disputed Debt*

When a consumer notifies a consumer reporting agency of a dispute regarding the accuracy of information contained in the consumer's credit report, the agency must reinvestigate the disputed information. As part of its reinvestigation, the agency must notify the furnisher of the credit information of the dispute. Section 1681s-2(b)(1) of the FCRA requires the furnisher to conduct an investigation regarding the dispute and to report its findings accordingly.[FN8]

> FN8. After receiving notice pursuant to section 1681(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall (A) conduct an investigation with respect to disputed information; (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2);(C) report the results of the investigation to the consumer reporting agency; and (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information." 15 U.S.C. § 1681s-2(b)(1).

The Act does not provide any indication as to the level of investigation required under § 1681s-2(b)(1) . Section 1681s-2(b)(1)'s investigation requirement for furnishers, however, "is analogous to the requirement imposed upon credit reporting agencies under § 1681i(a) to reinvestigate a consumer's dispute regarding information contained in his credit report" and, therefore, furnishers of credit are required to conduct a reasonable investigation. *Bruce v. First U.S.A. Bank, National Association,* 103 F.Supp.2d 1135, 1143 (E.D.Miss.2000). In *Bruce,* the Court employed two factors to determine whether a furnisher of information engaged in adequate investigation of a disputed debt: "(1) whether the consumer has alerted the agency that the initial source of the information may be unreliable or if the agency knows or should know that the source is unreliable, and (2) the cost of verifying the accuracy of the source versus the possible harm of reporting inaccurate information." *Bruce,* 103 F. Supp 2d 1135, 1143 (E.D.Mo.2000). Whether such an investigation has been conducted is generally a question of fact for the jury. *See Cushman,* 115 F.3d at 225; *Henson,* 29 F.3d at 287. Again, InoVision argues that the level of investigation it conducted satisfies the requirement imposed by the FCRA because the debt was accurate while Plaintiff disagrees. *See generally* Def. Mot. for Summ. J. at 13; Pl.'s Mot. for Summ. J. at 12-14. This factual disagreement cannot be resolved at summary judgment in either party's favor.

### B. Fair Debt Collection Practices Act Claims

**\*6** The Fair Debt Collection Practices Act ("FDCPA "), 15 U.S.C. § 1692 et seq., provides a remedy for consumers who have been subjected to abusive, deceptive, or unfair debt collection practices by debt collectors. *Pollice v. National Tax Funding, L.P.,* 225 F.3d 379, 400 (3d Cir.2000) *citing Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1167 (3d Cir.1987). In achieving this purpose, the FDCPA requires that the prohibited practices are used in an attempt to collect a "debt." 15 U.S.C. §§ 1692e-(f).[FN9]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN9. "Debt" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). In *Pollice,* the Court of Appeals affirmed the district court's conclusion that water and sewer obligations constitute "debt" for purposes of the FDCPA from the time they were initially owed to the respective entities and retained that status despite assignment or transfer of that debt. *Pollice,* 225 F.3d at 400. Similarly, Plaintiffs disputed utility account with PECO constitutes a debt that required her to pay money; that obligation arose out of a transaction for "services ... primarily for personal, family, or household purposes" and maintained its status as debt under the FDCPA despite InoVision's purchase of the debt.

### 1. Statute of Limitations

The statute of limitations under the FDCPA begins to run one year from the date of the violation.[FN10] In cases involving alleged violations of § 1692e, based upon letters sent to consumer, the statute of limitations begins to run on the day a debt collector mails a letter allegedly containing information proscribed by Act. *Mattson v. U.S. West Communications, Inc.,* 967 F.2d 259 (8th Cir.1992) . "The one year limitation period in the FDCPA, however, is jurisdictional and not subject to waiver or tolling." *Zhang v. Haven-Scott Assocs.,* 1996 U.S. Dist. LEXIS 8738 (E.D.Pa.1996) citing *Id.* at 262. *See also Chisolm v. Charlie Falk Auto Wholesalers, Inc.,* 851 F.Supp. 739, 749 (E.D.Va.1994); *Friedman v. HHL Fin. Serv., Inc.,* 1993 WL 286487, (N.D.Ill. July 29, 1993). The limitations period runs from the date of the alleged violation and not the date on which plaintiff became aware of it. *Maloy v. Phillips,* 64 F.3d 607, 608 (11th Cir.1995) (statute runs from date offending collection letter mailed and not date plaintiff received it).

FN10. Section 1692k-(d) reads in pertinent part: "An action to enforce any liability created by this title [15 U.S.C.S. 1692 et seq .] may be brought in any appropriate United States District Court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs." 15 U.S.C.S. § 1692k-(d).

However, at least one court has indicated that a cause of action might not accrue until receipt of the collection notice for purposes of the Act's one-year statute of limitations, 15 U.S.C. § 1692k(d). *Bates v. C & S Adjusters, Inc.,* 980 F.2d 865, 868 (2d Cir.1992) *citing Seabrook v. Onondaga Bureau of Medical Economics Inc.,* 705 F.Supp. 81, 83 (N.D.N.Y.1989) ("more likely" that statute would start to run only "on the date the debtor received the communication").[FN11] In addition to the apparent split among the circuits as to whether the statutory period commences when the collection agency mails the letter or when the debtor receives it, factual ambiguity in this case cautions the Court from making such a determination. Because the only written communication Plaintiff received from InoVision occurred some time in 2000 at an inexact date, the precise commencement of the statute of limitations tolling period is not readily ascertainable. "The primary purpose of statutes of limitations must be to reduce to a fixed interval the time between accrual of a right of action and commencement of the action and to put all on notice of that interval." *McClure v. Middletown Hosp. Ass'n,* 603 F.Supp. 1365 (D.C.Ohio 1985). That purpose would be ill-served by conclusions of fact made by the Court without proper documentary support. If neither party can proffer any documentary evidence to determine the date the statutory period should commence, the Court must allow such questions of disputed material fact to proceed to the jury.[FN12]

FN11. This analysis is consistent with that conducted of the statute of limitations under the FCRA, giving the potential plaintiff opportunity to discover the alleged violation. The FCRA, with one

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8

Not Reported in F.Supp.2d, 2003 WL 22999213 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

exception, contains a two-year statute of limitations. 15 U.S.C. § 1681p; *Houghton v. Insurance Crime Prevention Institute,* 795 F.2d 322, 324 (3d Cir.1986). The statute of limitations under the FCRA begins to run when the consumer first discovers the alleged violation or when the erroneous or incomplete consumer report is discovered. The limitations period for a suit, like this one, asserting negligence commences when the report issued to the user causes injury to the consumer for whose protection the FCRA was adopted, and the limitations period for a suit asserting an intentional violation begins at the same time, or if consumer is unaware of the issuance of the report, when she later discovers it. *Hyde v. Hibernia Nat. Bank,* 861 F.2d 446 (5th Cir.1988) *cert. denied* 491 U.S. 910, 109 S.Ct. 3199, 105 L.Ed.2d 706 (1989).

FN12. Defendant points only to Plaintiff's deposition testimony in which she says that InoVision contacted her via letter in " 2000.2001, maybe." *See* Pl.'s Mot. for Summ. J. at Ex. B, Agosta Dep.at 40, but she could not recall the specific date nor could she recall producing that document to her attorney. This is insufficient.

### 2. Genuine Issues Of Material Fact Preclude A Grant Of Summary Judgment With Respect to FDCPA Claims

#### a. *Least Sophisticated Consumer*

*7 Under the FDCPA, "statutory notice under the Act is to be interpreted from the perspective of the ' least sophisticated debtor." ' *Graziano v. Harrison,* 950 F.2d 107, 111 (3d Cir.1991) *citing Baker v. G.C. Servs.,* 677 F.2d 775, 778 (9th Cir.1982).[FN13] To comply with the terms of the [FDCPA], statutory notice must not only explicate a debtor's rights; it must do so effectively." *Id.* at 111 (citing *Swanson v. Southern Oregon Credit Serv.,* 869 F.2d 1222, 1225 (9th Cir.1988). This standard ensures that the FDCPA protects all consumers, regardless

of naivety. However, as InoVision notes, the least sophisticated consumer doctrine, while intended to protect individuals from unfair, abusive, or misleading collection practices, it will not impose liability for "bizarre or idiosyncratic interpretations of collection notices." *United States v. National Financial Services,* Inc. 98 F.3d 131, 136 (4th Cir.1996) *citing Clomon v. Jackson,* 988 F.2d 1314, 1318 (2nd Cir.1993) (quoting *Federal Trade Commission v. Standard Education Society,* 302 U.S. 112, 116, 58 S.Ct. 113, 82 L.Ed. 141, (1937)). The FDCPA preserves a quotient of reasonableness and requires a basic level of understanding and care on the part of the debtor. *Id.* InoVision argues that its collection practices did not reach the level of unreasonableness so as to sustain a claim under this provision, that its investigation verified the validity of the debt, and that said debt was properly reported to the credit reporting agencies. *See* Def. Mot. for Summ. J. at 23. Plaintiff, however, contends that despite its knowledge that the she last paid the PECO utility account in January and that the subsequent debt did not belong to her, InoVision knowingly reported incorrect delinquency. *See* Pl.'s Mot. for Summ. J. at 10-11. Because this material fact remains in dispute and because the question under the FDCPA is ultimately one of reasonableness, this Court cannot grant summary judgment as to the FDCPA claim.

FN13. *See also United States v. National Financial Services, Inc.,* 98 F.3d 131, 135 -136 (4th Cir.1996) (citing *Russell v. Equifax A.R.S.,* 74 F.3d 30, 34 (2nd Cir.1996); *Smith v. Transworld Systems, Inc.,* 953 F.2d 1025, 1028 (6th Cir.1992); *Jeter v. Credit Bureau,* 760 F.2d 1168, 1172-75 (11th Cir.1985) (deciding that Congress intended FDCPA to apply same standard as FTC Act, which was enacted to protect unsophisticated consumers, not only reasonable consumers who could otherwise protect themselves in the market place); *Baker v. G.C. Services Corp.,* 677 F.2d 775, 778 (9th Cir.1982); *Dutton v. Wolhar,* 809 F.Supp. 1130, 1141 (D.Del.1992) (applying least sophisticated debtor standard to section 1692e(10)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22999213 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

claim); *Wright v. Credit Bureau of Georgia, Inc.,* 555 F.Supp. 1005, 1007 (N.D.Ga.1983) (adopting "least sophisticated" reader test of the FTCA rather than the "reasonable consumer" test developed under the Truth in Lending Act); Bingham v. Collection Bureau, Inc., 505 F.Supp. 864, 870 (D.N.D.1981) (least sophisticated reader); *Bustamante v. First Fed. Sav. & Loan Ass'n,* 619 F.2d 360, 364 (5th Cir.1980) (applying "reasonable consumer" standard includes protection for the "unsophisticated or uneducated consumer"). *But see Swanson v. Southern Oregon Credit Service, Inc.,* 869 F.2d 1222, 1227 (9th Cir.1988); *Blackwell v. Professional Business Services, of Georgia, Inc.,* 526 F.Supp. 535, 538 (N.D.Ga.1981) (applying "reasonable consumer" test).

### b. Failure to Mark the Debt as Disputed

Plaintiff's claim that Ino Vision violated § 1692(e) by failing to communicate that she had disputed the validity of the debt is not supported by documentary evidence that she affirmatively disputed the debt with Ino Vision. Section 1692g(a)(3) requires that a debt collection notice submitted under the Act must include "a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector." While this statutory language does not expressly require that a debtor's dispute be in writing, there is strong support for reaching such a conclusion. *Graziano v. Harrison,* 950 F.2d 107, 111 -112 (3d Cir.1991). In *Graziano,* the plaintiff argued that because the notice he received from the defendant did not require a written dispute, that notice failed to satisfy the requirements of the FDCPA. To support this contention, he noted that three courts have concluded that under section 1692g(a)(3), if a debtor disputes a debt, the debt collector may not presume the validity of that debt without may dispute a debt, regardless of whether the dispute was in writing. *Id.*[FN14] In response, the defendant argued that §§ 1692g(a)(4) and 1692g(a)(5), expressly provide that the debtor

communication be in writing revealing a congressional intent to that effect. *Id.* The court concluded that "given the entire structure of section 1692g, subsection (a)(3) must be read to require that a dispute, to be effective, must be in writing." [FN15] The court further reasons that imposing a writing requirement avoids potential conflicts by creating a lasting record. *Id.* In this case, InoVision argues that the credit reporting agencies, and not InoVision failed to mark the debt as disputed and that no allegation that InoVision took or failed to take appropriate action is offered by Plaintiff. *See* Def.'s Opp. at 22. InoVision does not, however, provide specific facts in support of its suggestion that it complied with the duties imposed by the FDCPA sufficient to deny summary judgment in Plaintiff's favor as to this claim. Again, this claim ultimately turns, not on a question of law with respect to InoVision's obligations under the FDCPA, but rather on a question of material fact. As such, summary judgment is denied.

> FN14. This contention is further supported by *Brady v. Credit Recovery Co.* which provides that failure of debt collector to disclose disputed status of debt constitutes false, deceptive or misleading representation, does not impose writing requirement on consumer who wishes to dispute debt. *Brady v. Credit Recovery Co.,* 160 F.3d 64, 67 (1st Cir.1998). In reaching this conclusion, the court in *Brady* conducts a thorough statutory construction analysis to determine that despite the absence of clear definition in the FDCPA of the terms "dispute" or "disputed debt" in the section devoted to definitions, 15 U.S.C. § 1692a, ordinary usage of "dispute " does not contemplate a writing. *Brady,* 160 F.3d at 67.

> FN15. "Subsection (a)(3) states that unless the debtor disputes the debt within thirty days of receipt of notice, the debt collector will assume the debt to be valid. Subsection (a)(4) states that if the debtor disputes the debt in writing within thirty days, the debt collector must obtain

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 2003 WL 22999213 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

verification of the debt and must send the debtor a copy of the verification. Subsection (a)(5) states that, if the debtor makes a written request, the debt collector must provide the name and address of the original creditor. Subsection (b) states that if the debtor disputes the debt in writing within thirty days, the debt collector must cease collection efforts until the debt collector has verified the debt. Adopting Graziano's reading of the statute would thus create a situation in which, upon the debtor's non-written dispute, the debt collector would be without any statutory ground for assuming that the debt was valid, but nevertheless would not be required to verify the debt or to advise the debtor of the identity of the original creditor and would be permitted to continue debt collection efforts." *Graziano,* 950 F.2d at 111-112.

### C. Plaintiff's State Law Claims for Defamation, Negligence, and Invasion of Privacy are Preempted by the FCRA

*8 Finally, Plaintiff's claims for defamation, negligence, and invasion of privacy are preempted by the FCRA; as such, InoVision's Motion for Summary Judgment is granted with respect to those claims. The FCRA preempts claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law for willful and intentional failure to reinvestigate credit information disputed by consumer. *Jaramillo v. Experian Information Solutions,Inc.,* 155 F.Supp.2d 356 (E.D.Pa.2001). State law claims for negligence, defamation, and invasion of privacy may be preempted by the FCRA. *See Hasvold v. First USA Bank, N.A.,* 194 F.Supp.2d 1228, 1235 (D.Wy.2002); *Wiggins v. Philip Morris, Inc. et al.,* 853 F.Supp. 458, 466 (D.D.C.1994); *see also Riley v. General Motors Acceptance Corp.,* 226 F.Supp.2d 1316 (S.D.Ala.2002); *Vazquez-Garcia v. Trans Union De Puerto Rico,* 222 F.Supp.2d 150 (D.P.R.2002).

### IV. Conclusion

Accordingly, this Court denies the Plaintiff's Partial Motion for Summary Judgment and grants in part Defendant's Motion for Summary Judgment. An appropriate Order follows.

### *ORDER*

AND NOW, this day of December, 2003, upon consideration of the Defendant InoVision, Inc.'s Motion for Summary Judgment (Def.'s Mot. for Summ. J., Doc. No. 26) filed on April 14, 2003, Plaintiff's Opposition to Defendant InoVision Inc.'s Motion for Summary Judgment (Pl.'s Opp., Doc. No. 31) filed on May 12, 2003, the Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Def.'s Reply, Doc. No 37) filed by Defendant InoVision, Inc. on May 30, 2003, the Motion for Partial Summary Judgment (Pl.'s Mot. for Summ. J., Doc. No. 27) filed by Plaintiff on April 14, 2003, the Opposition to Plaintiff's Motion for Partial Summary Judgment (Def.'s Opp., Doc. No. 32) filed by Defendant InoVision, Inc. on May 14, 2003, and the Reply to Defendant InoVision's Opposition to Plaintiff's Motion for Partial Summary Judgment (Pl.'s Reply, Doc. No. 38) filed by Plaintiff on May 30, 3002., it is hereby ORDERED that Plaintiff's Motion for Summary Judgment is DENIED, that InoVision's Motion for Summary Judgment is DENIED in part and GRANTED in part, and that Counts IV, IX, and XI of Plaintiff's Complaint are dismissed, with prejudice.

E.D.Pa.,2003.
Agosta v. Inovision, Inc.
Not Reported in F.Supp.2d, 2003 WL 22999213 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                            Page 1

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Cheatle v. Katz
E.D.Pa.,2003.

United States District Court,E.D. Pennsylvania.
Robert S. CHEATLE, et al.
v.
David A. KATZ, et al.
**No. Civ.A. 02-4405.**

April 1, 2003.

Purchasers of real property sued vendors, claiming breach of vendor's contractual commitment to build house on premises. Vendors moved to dismiss and strike lis pendens. The District Court, Hutton, J., held that: (1) purchasers failed to state claim under Racketeer Influenced and Corrupt Organizations Act (RICO); (2) purchasers stated claim for piercing of corporate veil; (3) purchasers stated conversion claim; (4) purchasers stated unjust enrichment claim; (5) purchasers stated claim under Pennsylvania Unfair Trade Practices and Commercial Protection Law (UTPCPL); (6) purchasers stated claim under Pennsylvania Uniform Planned Community Act (UPCA); and (7) filing of lis pendens was warranted.

Motion granted in part, denied in part.
West Headnotes
**[1]    Racketeer    Influenced    and    Corrupt
Organizations 319H ☞69**

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(B) Civil Remedies and Proceedings
            319Hk68 Pleading
                319Hk69 k. In General. Most Cited
Cases
Purchasers of real property stated claim against vendors who undertook to construct house on premises, under Racketeer Influenced and Corrupt Organizations Act (RICO) provision barring

conduct of enterprise through pattern of racketeering activities; purchasers alleged predicate acts of mail and wire fraud, transmitting false promises, predicate acts were related, necessary continuity was present, and vendors undertook work through corporation that satisfied requirement that there be an enterprise. 18 U.S.C.A. § 1962(c).

**[2]    Racketeer    Influenced    and    Corrupt
Organizations 319H ☞62**

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(B) Civil Remedies and Proceedings
            319Hk56 Persons Entitled to Sue or
Recover
                319Hk62 k. Causal Relationship;
Direct or Indirect Injury. Most Cited Cases
Failure on part of purchasers of real property, to show they were injured by vendors' acquisition of control over corporation they founded to conduct construction work, as opposed to injury caused by faulty work, precluded claim that vendors acquired interest in enterprise through pattern of racketeering activity, in violation of Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1962(b).

**[3] Corporations 101 ☞1.6(8)**

101 Corporations
    101I Incorporation and Organization
        101k1.6    Particular    Occasions    for
Determining Corporate Entity
            101k1.6(8) k. Property and Transfer
Thereof. Most Cited Cases
Purchasers of real property stated claim for piercing of corporate veil, under Pennsylvania law, allowing suit against vendors of property for breach of contract to construct house, when contract was with corporation founded by vendors; purchasers alleged extensive involvement of vendor in negotiation of construction contract and building of house.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 2

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

**[4] Trover and Conversion 389 ⬥2**

389 Trover and Conversion
    389I Acts Constituting Conversion and Liability
Therefor
        389k2 k. Property Subject of Conversion.
Most Cited Cases
Purchasers of real property stated claim that
vendors converted money, under Pennsylvania law,
by making false representations in connection with
agreement to construct house on premises.

**[5] Trusts 390 ⬥91**

390 Trusts
    390I Creation, Existence, and Validity
        390I(C) Constructive Trusts
            390k91 k. Nature of Constructive Trust.
Most Cited Cases
Purchasers of real property stated claim of unjust
enrichment, supporting creation of constructive
trust, under Pennsylvania law, by alleging that
vendors fraudulently represented proposed
construction of house on premises, causing payment
unjustly enriching vendors.

**[6] Federal Civil Procedure 170A ⬥636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and
Particularity
                170Ak636 k. Fraud, Mistake and
Condition of Mind. Most Cited Cases
Purchasers of real property pleaded claim against
vendors with sufficient particularity, under
Pennsylvania Unfair Trade Practices and
Commercial Protection Law (UTPCPL), in
connection with vendors' undertaking to build house
on premises; purchasers alleged vendors knowingly
made material misrepresentations, including
vendor's contracting experience, materials used, and
code compliance, with intent that purchasers enter
into contract, and that purchasers would not have
entered into contract absent representations. 73
P.S. § 201-9.2; Fed.Rules Civ.Proc.Rule 9(b), 28
U.S.C.A.

**[7] Associations 41 ⬥20(5)**

41 Associations
    41k20 Actions by or Against Associations
        41k20(5) k. Pleading and Proof. Most Cited
Cases
Derivative claim asserted against vendors of real
property by purchasers acting on behalf of a
homeowners' association, alleging that the
association was a sham existing solely for the
vendors' enrichment, pleaded facts sufficient to
make a claim for a violation of fiduciary duty, and
thus stated a claim under the Pennsylvania Uniform
Planned Community Act (UPCA). 15 Pa. C.S.A. §
5712(a); 68 Pa. C.S.A. §§ 5101 et seq., 5303(a).

**[8] Lis Pendens 242 ⬥15**

242 Lis Pendens
    242k12 Notice of Pendency of Action
        242k15 k. Actions in Which Notice Is
Authorized. Most Cited Cases
Purchasers of real property properly filed lis
pendens on vendors' adjacent property, under
Pennsylvania law; purchasers alleged that as result
of poor performance of contract to construct house
on premises some electrical controls, including
sprinkler system, were located on vendors'
premises, creating title questions.

*MEMORANDUM AND ORDER*

HUTTON, J.
*1 In this case, the Plaintiffs, Robert and Nancy
Cheatle, are suing the Defendants, David and Dawn
Katz and several corporate entities controlled by
Mr. and Mrs. Katz, because of a failed real estate
transaction. Two motions are presently before the
Court. First, Defendants move to dismiss Plaintiffs'
complaint (Docket No. 4) pursuant to Federal Rule
of Civil Procedure 12(b)(6). Second, Defendants
move to strike (Docket No. 5) a *lis pendens* indexed
against their real property. For the reasons
discussed below, Defendants' Motion to Dismiss is
granted as to Plaintiff's claim under 18 U.S.C. §
1962(b). This motion is denied as to the remainder
of Plaintiffs' claims. Defendants' Motion to Strike
Lis Pendens is denied.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

## I. *BACKGROUND*

This is a lawsuit between two couples who are next-door neighbors, Robert and Nancy Cheatle and David and Dawn Katz. On October 30, 2000, the Cheatles entered into a contract to purchase approximately .81 acres of land from David Katz for $300,000. The property they purchased is located in Ambler, Pennsylvania. It is part of a four-lot subdivision, owned by Mr. Katz, known as Paradise Pines. The Cheatles purchased the lot adjacent to the Katz family home. They intended to build a home on this land.

Prior to purchasing this land, the Cheatles entered into a contract with Paradise Contractors, Inc. ("PCI "), an entity also owned by Mr. Katz, for the construction of a home in Paradise Pines. According to the contract, PCI was to be paid $650,000 for the construction of the Cheatles' home. The contract also imposed a series of specific obligations on PCI. According to the Cheatles, they entered into this contract because David Katz held himself out to be an experienced and skillful general contractor and construction manager.

During construction of the home, the Cheatles began to be unsatisfied with David Katz's work. In this suit, the Cheatles allege numerous incidents of fraud and breach of contract by David and Dawn Katz and the corporate Defendants. For example, Mr. Katz failed to properly manage the construction of the home and the delivery of materials. He failed to obtain the proper permits for the home. He substituted inferior materials for those specified in the agreement. He set up a sham homeowner's association and collected fees for it, among other allegations discussed below.

## II. *LEGAL STANDARD*

When considering a motion to dismiss a complaint for failure to state a claim under Rule 12(b)(6), the Court must accept as true all facts alleged in the complaint and any reasonable inferences that can be drawn therefrom. *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990) (citing *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988)); *see*

*also H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). A court may only dismiss a complaint where plaintiff can prove no set of facts, consistent with his allegations, which justifies relief. [FN1] *See ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); *Crighton v. Schuylkill County,* 882 F.Supp. 411, 414 (E.D.Pa.1995).

> FN1. Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).

**\*2** The court is not required to credit a plaintiff's " bald assertions" or "legal conclusions" when deciding a motion to dismiss. *See Id.* The Federal Rules merely require "a short and plain statement of the claim showing that the pleader is entitled to relief," enough to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Fed.R.Civ.P. 8(a)(2) (West 2001). In addition, when evaluating a complaint that includes allegations of fraud, as in the instant case, the court must apply Fed.R.Civ.P. 9(b), which contains a heightened pleading standard. [FN2]

> FN2. Federal Rule of Civil Procedure 9(b) provides, in part, that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

## III. *DISCUSSION-MOTION TO DISMISS*

In their motion, Defendants ask the Court to dismiss the following Counts in Plaintiffs' complaint: Counts I and II (Breach of Contract), Count IV (RICO), Count V (Conversion), Count VI (Unjust Enrichment), Count VII (Pennsylvania Uniform Trade Practices and Commercial Protection Law), and Count VIII (Uniform Planned Community Act). Each count is discussed below.

### A. *Count IV-Racketeer Influenced and Corrupt*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

*Organizations Act ("RICO")*

### 1. *Pattern of Racketeering Activity*

The RICO statute provides a civil action for "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Section 1962 contains four separate subsections that outline different RICO causes of action, two of which are implicated in this case. First, Section 1962(c) prohibits "any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). Second, Section 1962(b) prohibits any person from acquiring, maintaining an interest in, or controlling any enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(b). Accordingly, both provisions require the injured party to demonstrate that the defendant engaged in a "pattern of racketeering activity." *Tabas v. Tabas,* 47 F.3d 1280, 1289 (3d Cir.1995).

Under the statute, a "pattern of racketeering activity " requires the commission of at least two predicate offenses within a ten year period. 18 U.S.C. § 1961(5). Section 1961(1) enumerates the RICO predicate offenses, which include mail fraud and wire fraud. 18 U.S.C. § 1961(1). Commission of two such acts within a ten-years period, standing alone, is not enough to establish a pattern. In *H .J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) , the Court held that "to prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity." 492 U.S. at 239.

The first requirement, relatedness, is easily defined. *Id.* at 239. Predicate acts meet the relatedness requirement if they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics or are not isolated events." *Id.* at 240.

**\*3** The second requirement, continuity, is defined by the facts of the individual case. *Id.* at 241-42. Under *H.J., Inc.,* there are two kinds of continuity. First, "closed-ended continuity" refers to "a closed period of repeated conduct." *Id.* A party may establish closed-ended continuity by "proving a series of related predicates extending over a *substantial* period of time." *Id.* at 242 (emphasis added). Second, "open-ended continuity" describes "past conduct that by its nature projects in the future with a threat of repetition." *Id.* at 241. One way to establish open-ended continuity is to show that the predicates are part of the regular way of conducting defendant's ongoing legitimate business operations. *Id.* at 243. Regardless of which method is chosen, continuity is centrally a temporal concept, *i.e.,* it concerns the period of time over which the predicate acts occurred or may occur. *Id.* at 242.

#### a. Plaintiff's 1962(c) Claim

[1] In Defendants' Motion to Dismiss, they argue that Plaintiffs failed to adequately plead the existence of a pattern of racketeering activity. First, Defendants argue that the alleged predicate acts do not constitute mail or wire fraud. Defs.' Mot. at 2. [FN3] Second, Defendants argue that Plaintiffs have failed to establish the continuity and relatedness of the predicate acts, as required by *H.J., Inc. Id.;* Defs.' Mem. at 5-10. Finally, Defendants argue that the Section 1962(c) claims must be dismissed because the corporate defendants are impermissibly alleged to be both a "person" and an "enterprise" under the statute. Defs.' Mem. at 11. As discussed below, the Court finds that Plaintiffs have pled facts sufficient to state a Section 1962(c) claim. Accordingly, Defendants' Motion is denied as to this claim.

> FN3. Although Defendants raise this argument in their Motion, they only discuss the elements of mail fraud as those elements relate to the continuity analysis. Defs.' Mem. at 8-10. Nevertheless, this Court will briefly address this argument.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                            Page 5

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

#### (1) Predicate Acts

Plaintiffs allege that the individual defendants committed mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343. These statutes share the same essential elements, except that the wire fraud statute applies only to interstate or foreign transmissions. 18 U.S.C. § 1341, 1343; *Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (applying same analysis to both sets of elements); *United States v. Frey,* 42 F.3d 795, 797 n. 2 (3d Cir.1994) (finding mail fraud cases applicable to wire fraud statute); *Lubart v. Riley and Fanelli,* No. Civ.A. 97-6392, 1998 WL 398253 , at *2 (E.D.Pa. June 22, 1998) (collecting cases). Those essential elements are: (1) a scheme to defraud; and (2) use of the mails or wires for the purpose of executing the scheme. *Kehr Packages,* 926 F.2d at 1413. The actual violation is the use of the mails or wires. *Id.* Accordingly, true statements sent by mail or wire transmission are prohibited when made in furtherance of a scheme to defraud. *Schmuck v. United States,* 489 U.S. 705, 715, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989). Moreover, the mailing or wire transmission need not be sent to the victim of the scheme, so long as it is sent in furtherance of the scheme. *Albert Einstein Med. Ctr. v. Physicians Clinical Serv., Ltd.,* No. Civ.A. 90-3387, 1991 WL 193391, at *4 (E.D.Pa. Sept.19, 1991).

*4 In this case, Plaintiffs have alleged mail and wire fraud with the particularity required under Fed.R.Civ.P. 9(b). First, taking the Plaintiffs allegations as true, the Plaintiffs have established a scheme to defraud. According to the complaint, Defendants intentionally mislead Plaintiffs as to their experience as builders and real estate developers. Moreover, Plaintiffs also misled Defendants as to the existence of the Paradise Pines Homeowners Association. When the construction contract called for safeguards to ensure compliance, such as obtaining Township permits, the Plaintiffs allege that Defendants falsely reported that they obtained such permits. Accordingly, under the lenient standard applied at this stage of the proceedings, Plaintiffs have established facts supporting the existence of a scheme to defraud.

Second, Plaintiffs have also pled facts supporting their claims of mail and wire fraud. Plaintiffs allege that Defendants used the mails to send contracts and other writings related to their scheme to Horsham Township and to the Cheatles. Plaintiffs assert that these mailings were intended to defraud them by falsely asserting that Defendants had received the necessary permits from the Township to construct the home. Pls.' Compl. at 34. Second, Plaintiffs assert that Defendants used the mails to send fraudulent documents to Plaintiffs' lender. *Id.* Accordingly, the Court finds that Plaintiffs have set forth a set of facts which could establish mail and wire fraud.

#### (2) Relatedness of the Predicate Acts

The Court finds that the predicate acts are related. The Third Circuit has noted that "the relatedness test will nearly always be satisfied in cases of mail fraud stemming from the same fraudulent transaction-by definition the acts are related to the same 'scheme or artifice to defraud.' " *Kehr Packages,* 926 F.2d at 1414. In that case, the Plaintiffs alleged numerous acts of mail fraud relating to the same loan transaction, thereby satisfying the relatedness prong. *Id.* at 1417. Similarly, in this case, Plaintiffs allege at least two incidents of mail fraud relating to the construction contract and its implementation. Pls.' Compl. at 34. Accordingly, the Plaintiffs have pled sufficient facts to meet the relatedness prong.

#### (3) Continuity

As noted above, predicate acts must be continuous in order to form a "pattern of racketeering activity." *H.J., Inc.,* 492 U.S. at 242. To meet this requirement, a Plaintiff must show either closed-ended or open-ended continuity. *Id.* In this case, Defendants' argue that Plaintiff has not met either continuity test. As this Court determines that Plaintiffs pleaded facts sufficient to establish closed-ended continuity, it is unnecessary to discuss open-ended continuity at this time.

As noted above, even innocent mailings related to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

fraudulent scheme are considered mail fraud. In civil RICO cases based on the predicate acts of mail or wire fraud, however, the continuity test requires the court "to look beyond the mailings and examine the underlying scheme or artifice." *Kehr Packages,* 926 F.2d at 1414. As a result, continuity in mail fraud cases is based on the duration of the underlying scheme, rather than the length of time during which the mailings were actually sent. *Tabas,* 47 F.3d at 1294.

*5 In *Tabas,* the Third Circuit discussed the requirements for proving a series of related predicate events over a substantial period of time. *Id.* at 1292. In reviewing five of its precedents on this issue, the Court found that "each time conduct .. . last[ed] no more than twelve months [it] did not meet the standard for closed-ended continuity." *Id.* at 1293. In *Tabas* itself, the Court found that a scheme lasting three and one half years met the " substantial period of time" test. *Id.* at 1294. The *Tabas* court also noted two cases, *United States v. Pelullo,* 964 F.2d 193, 209-10 (3d Cir.1992) and *Swistock v. Jones,* 884 F.2d 755, 759 (3d Cir.1989), indicating that periods of 19 months and 14 months, respectively, may be sufficient to constitute closed-ended continuity.[FN4] *Id.* at 1294.

> FN4. This Court notes, however, that *Swistock* also contained evidence of a continuing series of predicate acts, indicating that the conduct was also open-ended. *Pelullo,* 964 F.2d at 210.

Defendants argue that, although the alleged scheme lasted in excess of one year, this Court must consider the number of predicate acts and the number of victims in evaluating continuity. Defs.' Mem. at 8-10. While Defendants are correct that " the number of [predicate acts] remains a factor," *Pelullo,* 964 F.2d at 210, at this stage in the proceedings, the Court finds that Plaintiffs' pleaded sufficient facts to establish closed-ended continuity. In this case, Plaintiffs assert that Defendants engaged in a scheme to defraud, which lasted over two years, beginning in August 2000 and continuing through August 2002. Pls.' Mem. at 9. As this exceeds the length of the scheme in *Pelullo,*

closed-ended continuity has been sufficiently established.

### (4) *Enterprise Requirement*

In this circuit, a plaintiff must allege a 1962(c) violation by a "person" [FN5] operating or managing a distinct and separate "enterprise." [FN6] *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.,* 46 F.3d 258, 262-64 (3d Cir.1995) (tracing distinctiveness requirement in Third Circuit). Defendants argue that Plaintiffs' RICO claims are legally insufficient because the corporate defendants in the action are alleged to be both " persons" and an "enterprise" for purposes of the act. Defs.' Mem. at 11. Defendants correctly point out that if such a dual role is pled, then Plaintiffs' complaint cannot be allowed to proceed.

> FN5. For RICO purposes, "person" includes "any individual or entity capable of holding a legal or beneficial interest in property ." 18 U.S.C. § 1961(3).

> FN6. "Enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity." 18 U.S.C. § 1961(4).

In response, Plaintiffs argue the enterprise requirement is met because they pleaded that each corporate defendant is part of a larger enterprise, an association in fact that the Plaintiffs have termed the "Paradise Enterprise." Pls.' Mem. at 13. In support of this argument, Plaintiffs point to *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* No. Civ.A. 95-1698, 1995 WL 455969 (E.D.Pa. July 27, 1995) and *PTI Services, Inc. v. Quotron Sys., Inc.,* No. Civ.A. 94-2068, 1995 WL 241411, at *12 (E.D.Pa. April 19, 1995), for the proposition that a RICO enterprise may include a group of corporations and individuals acting as an association in fact. Pls.' Mem. at 13-14.

In *Brokerage Concepts,* the plaintiff asserted a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

Section 1962(c) claim against two corporations and several employees of those corporations. 1995 WL 455969 at *6. Defendants moved to dismiss the complaint, in part, on the grounds that a corporation cannot be both a RICO person and a RICO enterprise. *Id.* The Court, agreeing with this statement of the law, found that none of the corporate defendants were alleged to be both persons and enterprises, because the plaintiff alleged that the corporations were part of a broader enterprise that included the individual defendants. *Id.* Similarly, in this case, Plaintiffs pleaded that the corporate defendants and the individual defendants are part of a larger association in fact. Accordingly, Plaintiffs have adequately established the existence of a separate enterprise.

### b. Plaintiffs' 1962(b) Claim

*6 [2] In Count IV of the their complaint, Plaintiffs also assert that Defendants violation Section 1962(b) . This section provides, in pertinent part, that "[i]t shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest or control in of an interest in a RICO enterprise." 18 U.S.C. § 1962(b). Thus, under this section of the Act, a plaintiff must allege an injury from the defendant's acquisition or control of the enterprise, *in addition to* an injury from the predicate acts. *Lightning Lube, Inc. v. Witco Corp. .,* 4 F.3d 1153, 1190 (3d Cir.1993); *Dianese, Inc. v. Pennsylvania,* No. Civ.A. 01-2520, 2002 WL 1340316, at *9 (E.D.Pa. June 29, 2002). In *Lightning Lube,* the court stated, as an example, that such an injury occurs when "the owner of an enterprise infiltrated by the defendant as a result of racketeering activities is injured by the defendant's acquisition or control of [the] enterprise." 4 F.3d at 1190. A Section 1962(b) claim is insufficient if it merely restates the same injury that a 1962(c) claim is meant to remedy. *Id.* at 1191. Moreover, the plaintiff in a Section 1962(c) action must show a " nexus between the interest [in the enterprise] and the alleged racketeering activities." *Id.* at 1190. It is insufficient to merely show that a person engaged in racketeering activity has an otherwise legitimate interest in the enterprise. *Id.*

Plaintiffs' complaint fails to make any allegations that, apart from the racketeering activities, they were injured as a result from defendant's acquisition or control of the Paradise Enterprise. Instead, Plaintiffs merely state that David and Dawn Katz " engaged in a pattern of racketeering activity to ... foster directly or indirectly, their interests in and economic gain in the Paradise Enterprise...." Pls.' Compl. at 35. Under *Lightning Lube,* Plaintiffs cannot maintain a Section 1962(b) action by merely restating their Section 1962(c) claim in this manner. Accordingly, Defendants' motion is granted as to Plaintiffs' 1962(b) claim.

### B. Counts I and II-Breach of Contract

[3] Defendants seek dismissal of Plaintiffs' breach of contract claims (Counts I and II) on the grounds that the individual defendants, as shareholders of the corporate defendants, cannot be held personally liable for the acts of the corporate defendants. In Pennsylvania, shareholders, officers and directors of a corporation are not liable for a corporation's breach of contract, absent establishment of either participation theory or the equitable doctrine of piercing the corporate veil. *First Reast Vest, Inc. v. Avery Builders, Inc.,* 410 Pa.Super. 572, 600 A.2d 601, 603 (Pa.Super.1991). Under participation theory, liability falls on the individual, rather than the corporation, when the record establishes the individual's participation in tortious activity. *Wicks v. Milzoco Builders, Inc. .,* 503 Pa. 614, 470 A.2d 86, 90 (Pa.1983). In contrast, a court pierces the corporate veil upon a finding that the corporation is not a bona fide independent entity. *Id.* at 89-90. Under Pennsylvania law, courts are reluctant to pierce the corporate veil, doing so "only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." *Sams v. Redevelopment Auth.,* 431 Pa. 240, 244 A.2d 779, 781 (Pa.1968).

*7 The Court finds that Plaintiffs have pleaded sufficient facts to implicate the equitable doctrine of piercing the corporate veil. In the complaint, Plaintiffs allege that the various corporate Defendants are merely alter egos for David and Dawn Katz. To support this allegation Plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

point to David Katz's participation in the negotiations process and his role in building the Plaintiffs' home. Taking Plaintiffs' allegations as true, the Court finds that they have set forth facts sufficient to make out a claim for application of the doctrine of piercing the corporate veil.

### C. *Count V-Conversion*

[4] Under Pennsylvania law, "[c]onversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Shonberger v. Oswell,* 365 Pa.Super. 481, 530 A.2d 112, 114 (Pa.Super.1984). Pennsylvania courts do not require the actor to have specific intent, rather, any intent to assert control over the chattel in a way that is detrimental to the owner's property rights is sufficient. *Id.* Money may be the subject of conversion. *Id.* A claim for conversion is not made out, however, when the plaintiff is merely restating a claim for breach of contract. *Montgomery v. Fed. Ins. Co.,* 836 F.Supp. 292, 302 (E.D.Pa.1993).

In *Montgomery,* the plaintiff brought two claims for conversion that were very similar to his breach of contract claims. *Id.* at 300. Specifically, the plaintiff claimed that the defendant insurance company converted his premium payments when it failed to pay on his claim. *Id.* In his conversion claim, the plaintiff sought punitive damages. *Id.* The court found that, because there was no evidence of fraud or bad faith in the case, the plaintiff could not make out a claim for punitive damages. *Id.* Accordingly, the conversion claim and breach of contract claim were identical. *Id.* As a result the court granted summary judgment against the plaintiff on its conversion claim. *Id.* at 302. In contrast, as discussed in Part III.E. *supra,* the Cheatles pleaded sufficient facts to support a claim for fraud. Accordingly, Plaintiffs' conversion claim survives Defendants' motion to dismiss.

### D. *Count VI-Unjust Enrichment/Constructive Trust*

[5] In Count VI of the complaint, Plaintiffs assert a claim of unjust enrichment against Defendants and ask this Court to impose a constructive trust on the money paid by the Cheatles to Defendants. Pls.' Compl. at 37. Defendants seek dismissal of this Count on the grounds that Plaintiffs' are seeking the payment of debt, which cannot be the subject of a constructive trust under Pennsylvania law. Defs.' Mem. at 14.

To make out a claim for unjust enrichment, a plaintiff must show: "(1) a benefit conferred upon one party by another; (2) appreciation of such benefit by the recipient; and (3) retention of that benefit under circumstances that would be unjust." *Styer v. Hugo,* 422 Pa.Super. 262, 619 A.2d 347, 350 (Pa.Super.1993). Taking Plaintiffs' allegations as true, they claim that they paid large sums of money to Defendants as a result of a fraudulent scheme. Defendants kept these payments. Accordingly, this court finds that Plaintiffs have pled facts sufficient to state an unjust enrichment claim.

\*8 A constructive trust is a remedy created by equity to prevent unjust enrichment. *Huber v. Wagner,* 284 Pa.Super. 133, 425 A.2d 456, 458 (Pa.Super.1981). The need for such a remedy usually arises out circumstances involving fraud, accident, mistake, duress, or undue influence. *Id .* (citing *Yohe v. Yohe,* 466 Pa. 405, 353 A.2d 417 (Pa.1976). Despite Defendants' assertion to the contrary, Plaintiffs have pled substantial allegations of fraud in their complaint. Accordingly, this Count cannot be dismissed on the grounds that the remedy sought is improper. Defendants' motion is denied as to this count.

### E. *Count VII-Pennsylvania Unfair Trade Practices and Commercial Protection Law*

[6] In Count VII of the complaint, Plaintiffs assert a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. tit. 73, §§ 201-1-201-9.2 (West 1993 & Supp.2000) ("UTPCPL"). Section 3 of the Act prohibits twenty-one types of "unfair or deceptive practices," including "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

Pa. Stat. Ann. tit. 73 § 201-3(xxi). Section 9.2 of the Act provides a private action for "any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property as a result of a the use of employment of any practice declared unlawful by [Section 3 of the Act]." Pa. Stat. Ann. tit. 73 § 201-9.2.

Defendants seek dismissal of this Count on the grounds that Plaintiffs did not adequately plead facts demonstrating fraud by the Defendants. Defs.' Mem. at 15. As Defendants correctly point out, to state a cause of action under the UTPCPL's " catch-all" provision, Plaintiffs must plead all the elements of fraud. *Skurnowicz v. Lucci,* 798 A.2d 788, 794 (Pa.Super.2002) (citing *Sewak v. Lockhart,* 699 A.2d 755, 761 (Pa.Super.1997)). In Pennsylvania, the elements of fraud are: (1) a representation; (2) which is material to the transaction in question; (3) made falsely, with knowledge of the falsity or reckless disregard for the truth; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) injury proximately caused by the reliance. *Id.* at 793 (citing *Bortz v.. Noon,* 556 Pa. 489, 729 A.2d 555, 560 (Pa.1999)). A misrepresentation is material if the transaction would not have been consummated but for the misrepresentation. *Id.* (citing *Sewak,* 699 A.2d at 760). In all actions brought under the UTPCPL, the plaintiff must demonstrate "an ascertainable loss *as a result of* the defendant's prohibited action." *Weinberg v. Sun Co., Inc.,* 565 Pa. 612, 777 A.2d 442, 446 (Pa.2001) (emphasis in original).

Taking Plaintiffs' allegations as true for purposes of this motion, the Court finds that the elements of fraud have been pled with sufficient particularity. *See* Fed.R.Civ.P. 9(b). Plaintiffs assert that De fendants made numerous misrepresentations, including statements about Mr. Katz's experience as a builder, the materials used in the home, and code compliance. Pls.' Compl. at 25-27. Second, Plaintiffs have pled that these representations were material because, absent these statements, they would not have engaged in the transaction. Third, Plaintiffs aver that Defendants knew these representations were false. Fourth, Plaintiffs assert

that the intent of these misrepresentations was to persuade the Cheatles to enter the transaction. Fifth, the Chealtes claim that there was no evidence to indicate that David and Dawn Katz were not successful real estate developers. Finally, Plaintiffs extensively pleaded facts showing damages. Accordingly, Defendants' motion is denied as to this Count.

### F. *Count VIII-Pennsylvania Uniform Planned Community Act*

**\*9** [7] In Count VIII of the complaint, Plaintiffs assert a claim under the Pennsylvania Uniform Planned Community Act (UPCA), 68 Pa. Cons.Stat. Ann. §§ 5101-5414 (West 1994 & Supp.2000). In their complaint, Plaintiffs state that "[d]efendant Paradise Pines [Homeowners' Association] is unwilling and unable to take action to assert demands against David and Dawn Katz, and only by the Cheatles' claims and interposition of this Court can the rights of the Cheatles, and the HOA Corporation be properly managed and the individual Defendants' acts and omissions remedied. " Pls.' Compl. at 38. In their response to Defendants' motion to dismiss, Plaintiffs characterize this Count as a derivative claim "on behalf of the Defendant Paradise Pines Homeowners' Association against Defendants." Pls.' Mem. at 21.

The UPCA provides that officers and members of a homeowners' association executive board stand in a fiduciary relationship to the association and must perform their duties with care and good faith. 68 Pa. Cons.Stat. Ann. § 5303(a) (West 1994 & Supp.2000). Under Pennsylvania law, the duty of care requires that directors serve the best interests of the corporation and act with the level of care, including reasonable inquiry, skill, and diligence, of an ordinarily prudent person under similar circumstances. 15 Pa. Cons.Stat. Ann. § 5712(a) (West 2002). Taking Plaintiffs' version of the facts as true, they pleaded facts sufficient to make a claim for a violation of fiduciary duty. Specifically, Plaintiffs allege that the Paradise Pines Homeowners' Association was a sham, existing solely for the enrichment of David and Dawn Katz.

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

Pls.' Compl. at 26. Accordingly, this Court finds that this Count survives Defendants' Motion to Dismiss.

## IV. *DISCUSSION-MOTION TO STRIKE LIS PENDENS*

[8] The doctrine of *lis pendens* pertains to actions in equity affecting title to real property. *See Pen-Del Mortgage Associates v. FDIC,* CIV.A. No. 94-0067, 1994 WL 318445, *2 (E.D.Pa. June 30, 1994) (Hutton, J.). *Lis Pendens,* or suit pending, is the power, jurisdiction or control which a court acquires over property involved in the pending action until final judgment is entered. *See Pen-Del Mortgage Associates,* 1994 WL 318445, *2. The filing of *lis pendens* does not establish a *lien* against the property. *See Dice v. Bender,* 383 Pa. 94, 117 A.2d 725 (1955). Rather, it merely serves as notice to third parties that they risk being bound by an adverse judgment. *See McCahill v. Roberts,* 421 Pa. 233, 219 A.2d 306 (1966). Indeed, the indexing of *lis pendens* functions as constructive notice to prospective buyers. *See Ricci v, Saia,* 13 Pa. D. & C.3d 361 (1980) (citing *Tourison's Estate,* 321 Pa. 299, 184 Atl. 95 (1936)). "[A] potential purchaser can readily ascertain whether there is a claim affecting the property." *See Chrysler Corp. v. Fedders Corp.,* 670 F.2d 1316, 1329 (3d Cir.1981).

*Lis pendens* is properly filed against a property only when the litigation involves a determination of rights involved with that property. *See Short v. Weinrebe,* CIV.A. No. 87-5057, 1988 WL 12511 (E.D.Pa. Feb.17, 1988). Either title to the property or the premise itself must be implicated in the suit. *See First National Bank of Mercer County v. Allstate Distributors Inc.,* 25 Pa. D. & C.3d 329, 333 (1982).

*10 The doctrine of *lis pendens* is rooted in common law and equitable principles. *Id.* at 331. As such, this doctrine remains subject to equitable principles. *See Id.* at 331; *see also Dice,* 283 Pa. 94. "In deciding whether to strike a *lis pendens,* the court must balance the equities to determine whether the application of the doctrine is harsh or arbitrary and whether cancellation of the *lis pendens*

would result in prejudice to the nonpetitioning party. " *See Pen-Del Mortgage Associates,* 1994 WL 318445, *2.

In the instant case, Plaintiffs assert that Defendants promised to construct Plaintiffs' home exactly as specified in the contract. Defendants, however, failed to obtain the necessary variances. Consequently, Defendants made unauthorized modifications to the house, which affected property boundaries. *See* Plnt. Response to Deft. Mot. to Strike p. 4. As a result, Plaintiffs allege that some of their electrical controls, including Plaintiffs' sprinkler system, have been installed on what is being held out as Defendants' property. Plaintiffs contend that if full relief is granted to them, Defendants will have to cede the land in question to the Plaintiffs, thereby putting the land in issue. This may also cloud Defendants' title. In addition, Defendants have recently put their home up for sale. *See* Plnt. Ext. "5." An indexed *lis pendens* would put any prospective purchasers on notice of the potential boundary shifting.

Balancing the equities of the instant case, the Court finds that Defendants' motion must be denied. First, Plaintiffs put forth evidence showing that this action directly impacts Defendants' title to the land. In response, Defendants present no evidence disputing Plaintiffs' assertions implicating potential boundary disputes or refuting the notion that some of the land would have to be ceded as a remedy. Moreover, the purpose of the *lis pendens,* to provide constructive notice to potential purchasers, is implicated in this case. Accordingly, Defendant's Motion is denied.

## V. *CONCLUSION*

Pursuant to Federal Rule of Civil Procedure 12(b)(6) , a court may only dismiss a complaint where plaintiff can prove no set of facts, consistent with his allegations, which justifies relief. In this case, Plaintiffs have pled sufficient facts to state a claim for each of their Counts, except one. Plaintiffs' Section 1962(b) claim must be dismissed. Defendants' motion is denied as to all other claims.

Under Pennsylvania law, the indexing of *lis pendens*

Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489
**(Cite as: Not Reported in F.Supp.2d)**

functions as constructive notice to prospective buyers. *Lis pendens* is properly filed against a property only when the litigation involves a determination of rights involved with that property. In this case, Plaintiffs aver that, if they are granted the full extent of the relief sought, Defendants will be forced to cede land to the Plaintiffs. Thus, the title to Defendants' property is implicated by the instant suit. Accordingly, Defendants' Motion to Strike Lis Pendens is denied.

*11 An appropriate Order follows.

### ORDER

AND NOW, this 1st day of April, 2003, upon consideration of Defendants' Motion to Dismiss (Docket No. 4) and Defendants' Motion to Strike Lis Pendens (Docket No. 5), IT IS HEREBY ORDERED that:

(1) Defendants' Motion to Dismiss (Docket No.4) is GRANTED IN PART AND DENIED IN PART, as follows:

(A) Defendants' Motion is GRANTED as to Plaintiffs' claim under 18 U.S.C. § 1962(b) and this claim is DISMISSED;

(B) Defendants' Motion is DENIED as to the remainder of Plaintiffs' claims; and

(2) Defendants' Motion to Strike Lis Pendens (Docket No. 5) is DENIED.

E.D.Pa.,2003.
Cheatle v. Katz
Not Reported in F.Supp.2d, 2003 WL 21250583 (E.D.Pa.), RICO Bus.Disp.Guide 10,489

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 166566 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

▷
Christopher v. First Mutual Corp.
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
John J. CHRISTOPHER
v.
FIRST MUTUAL CORP. Richard Kelly Associates
Financial Services Corp.
**No. Civ.A. 05-01149.**

Jan. 20, 2006.

Anthony Bernard Quinn, Philadelphia, PA, for John
J. Christopher.

Colleen A. Garrity, Smith Giacometti & Chikowski
LLC, Barbara Kiely, Reed Smith, Philadelphia, PA,
for First Mutual Corp. Richard Kelly Associates
Financial Services Corp.

*MEMORANDUM*

ONEILL, J.
*1 Plaintiff John Christopher filed a complaint in
the Court of Common Pleas of Philadelphia County
on January 28, 2005 against defendants First
Mutual Corp., Richard Kelly, and Associates
Financial Services Corp. ("Associates"), alleging
violations of the Equal Credit Opportunity Act ("
ECOA"), the Home Ownership Equity Protection
Act ("HOEPA"), the Real Estate Settlement
Procedures Act ("RESPA"), and claims under state
law. Defendants First Mutual and Kelly removed
the action to this Court. Jurisdiction is based on 28
U.S.C. § 1331 and 28 U.S.C. § 1367. Before me
now are Associates' motion to dismiss, plaintiff's
response, and Associates' reply thereto.

BACKGROUND

John Christopher owns a row home in north
Philadelphia. In 1995, he took out a home equity
loan through East Coast Mortgage to finance home

improvements ("1995 Loan"). The principal
balance was $11,800 and the monthly payment was
$165.00. The 1995 Loan was reassigned multiple
times, ultimately to Money Store.

On November 7, 1997, after receiving a
telemarketing call from Kelly, a mortgage broker,
Christopher refinanced the 1995 Loan through First
Mutual ("1997 Loan"). The mortgage covered the
home equity loan and also refinanced Christopher's
first mortgage. The principal balance was $22,000,
with monthly payments of $254.63 over fifteen
years. Christopher alleges that more than ten
percent of the loan was used to pay fees. The 1997
Loan was subsequently assigned to Associates.

On November 30, 1998, after another call from
Kelly, Christopher refinanced the 1997 Loan, again
through First Mutual ("1998 Loan"). The principal
balance of the 1998 loan was $31,000, with
monthly payments of $365.11 over fifteen years.
Associates allegedly demanded $21,645 to satisfy
the $22,000 mortgage. The 1998 Loan was later
assigned to Associates.

In January 2000, Plaintiff once again agreed to
refinance. He refinanced the 1998 Loan through
First Mutual ("2000 Loan") on January 31, 2000.
The 2000 Loan had a principal amount of
$38,250.00, with monthly payments of $321.63
over thirty years. Plaintiff alleges that Associates
required $30,870 to satisfy the 1998 Loan, which
had an original principal of $31,000. More than
nine percent of the loan was used to pay fees. The
remainder of the loan paid off plaintiff's real estate
taxes and utility bills. The 2000 Loan was
subsequently assigned to Homeq Servicing
Corporation.

In Christopher's complaint, he seems to assert four
different claims against Associates.[FN1] First, in
Count IV, Christopher claims that Associates
violated the Pennsylvania Unfair Trade Practices
and Consumer Protection Law ("UTPCPL"), 73

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 166566 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

P.S. § 201-1 et. seq., by imposing "credit costs and charges expressly prohibited by Federal and Pennsylvania Law" and engaging in "fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding." In Count VI, Christopher asserts that all defendants "made material misrepresentations and omitted material information in order to induce plaintiff to consummate the home equity loan." These misrepresentations included (1) the failure to disclose that a third-party broker was being used; (2) the representations that the home equity loan was beneficial to him and necessary to finance the home improvements; and (3) failing to explain why some loan proceeds were used to pay tax and utility bills. In Count VII, Christopher alleges a RESPA violation. He claims that "in the course of this transaction the lender gave the loan broker a fee, kickback, or thing of value pursuant to an understanding between the lender and the broker that the broker would refer business to the lender" and that "the fee paid to the lender for recording and other charges was a payment" based on services not actually performed. In Count IX, Christopher asserts a breach of contract claim, arguing that Associates demanded amounts in excess of that due under the mortgage and that the interest and finance charges in the loan held by Associates exceeded permissible amounts. Christopher does not specify which loan gave rise to the breach of contract claim.

> FN1. The majority of his claims are asserted against First Mutual and Kelly.

## STANDARD OF REVIEW

*2 Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6) (2004). In ruling on a 12(b)(6) motion, I must accept as true all well-pleaded allegations of fact, and any reasonable inferences that may be drawn therefrom, in plaintiff's complaint and must determine whether " under any reasonable reading of the pleadings, plaintiffs may be entitled to relief." *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996) (citations omitted). Nevertheless, in evaluating plaintiff's pleadings I

will not credit any "bald assertions." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429 (3d Cir.1997). Nor will I accept as true legal conclusions or unwarranted factual inferences. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The complaint will be deemed to have alleged sufficient facts if it adequately put the defendant on notice of the essential elements of the plaintiff's cause of action." *Nami,* 82 F.3d at 65. A Rule 12(b)(6) motion is proper only if the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46.

## DISCUSSION

### 1. Count IV-UTPCPL Violations

In Christopher's UTPCPL claims, he asserts that Associates imposed expressly prohibited credit costs and other charges and otherwise engaged in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding. The basis for these claims seems to be Associates' " overcharge of the mortgage." [FN2]

> FN2. The overcharge is the only fact attributed to Associates in Christopher's complaint. He does not describe any personal interaction with Associates, only that two loans were ultimately assigned to them and they received more than the outstanding principal when he refinanced.

The Pennsylvania UTPCPL contains twenty specific forms of prohibited conduct and a catchall provision covering other forms of "fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 Pa. Cons.Stat. § 201-2 (2005). The UTPCPL is to be liberally construed to effectuate the legislature's goal of consumer protection. *Commonwealth v. Monumental Properties Inc.,* 460, 459 Pa. 450, 329 A.2d 812, 817 (Pa.1974); *Keller v. Volkswagen of America, Inc.,* 733 A.2d 642, 646 (Pa.Super.Ct.1999). Christopher seems to assert his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                            Page 3

Not Reported in F.Supp.2d, 2006 WL 166566 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

claims against Associates under 73 Pa. Cons.Stat. §
201-2(xxi), the catchall provision.[FN3]

> FN3. In his complaint, Christopher cites
> three separate parts of 73 Pa. Cons.Stat. §
> 201-2. One section follows an allegation
> addressed specifically to actions by
> defendant Kelly. Christopher also asserts a
> violation of 73 Pa. Cons.Stat. § 201-2(v)
> against Associates by addressing the claim
> to "all defendants" in his complaint, but
> seems to retract this claim in his response
> to Associates' motion to dismiss. He also
> alleges no specific facts in either his
> complaint or his response which would
> give rise to Associates' liability under that
> UTPCPL section.

The catchall provision originally only covered
fraudulent conduct, and courts interpreting the
statute required the plaintiff to meet the increased
requirements for pleading fraud. *See, e.g., Hammer
v. Nichol,* 659 A.2d 617, 619-20 (Pa.Super.1995);
Prime Meats, Inc. v. Yochim, 422 Pa.Super. 460,
619 A.2d 769 (Pa.Super.1993). In 1996, however,
the Pennsylvania legislature amended the catchall
provision, expanding it to cover both fraudulent and
deceptive conduct. Since then, courts have divided
on whether a plaintiff must meet the heightened
fraud pleading requirement. *Compare Skurnowicz v.
Lucci,* 798 A.2d 788, ¶ 19 (Pa.Super.2002)
(plaintiff must plead elements of common law
fraud), *with* Flores v. Shapiro & Kreisman, 246
F.Supp.2d 427, 432 (E.D.Pa.2002) ("by adding a
prohibition on "deceptive" conduct, the 1996
amendment to the CPL eliminated the need to plead
all of the elements of common law fraud in actions
under the CPL"). The Pennsylvania Supreme Court
has not yet addressed this issue.

**\*3** I review the 1996 changes in the statute with the
goals of effectuating the legislature's purpose,
giving meaning to every word in the statute, and
making the amendment have meaning. As the
Supreme Court has noted, "It is our duty 'to give
effect, if possible, to every clause and word of a
statute.' " *United States v. Menasche,* 348 U.S.
528, 538, 75 S.Ct. 513, 99 L.Ed. 615 (1955) *quoting*

*Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct.
391, 27 L.Ed. 431 (1882); *see also Flores v.
Shapiro & Kreisman,* 246 F.Supp.2d 427, 432
(E.D.Pa.2002) ("Under general principles of
statutory interpretation, no word should be rendered
redundant."). Courts have previously recognized the
legislature's broad goal to protect consumers in
these transactions. *See, e.g., Keller,* 733 A.2d at 646
("It is to be liberally construed in order to effectuate
its purpose."). Further, the legislature must have
had a reason for amending the statute to add "
deceptive." Considering these factors, I find under
the amended statute, the catchall provision extends
consumer protection to cover both fraudulent and
deceptive conduct. It is no longer necessary for a
plaintiff to plead all of the elements of common law
fraud to recover under the UTPCPL catchall
provision. If a plaintiff alleges fraud under the
UTPCPL, he must still plead all the elements of
common law fraud. If a plaintiff alleges deceptive
conduct under the UTPCPL, however, he need not
meet the traditional heightened pleading standard. I
will review Christopher's assertions to see if they
fall under either category.

Christopher has failed to assert a fraud claim upon
which relief can be granted. The elements of fraud
in Pennsylvania are: (1) a representation; (2) which
is material to the transaction in question; (3) made
falsely, with knowledge of the falsity or reckless
disregard for the truth; (4) with the intent of
misleading another into relying on it; (5) justifiable
reliance on the misrepresentation; and (6) injury
proximately caused by the reliance. *See Youndt v.
First Nat'l Bank,* 868 A.2d 539, 545
(Pa.Super.2005); *see also Bortz v. Noon,* 556 Pa.
489, 729 A.2d 555, 560 (Pa.1999). Christopher has
not alleged any contact with Associates, and has
also not specified any misrepresentations made by
Associates. Therefore, his claim cannot fall under
the "fraudulent" part of the catchall provision.

Christopher's UTPCPL claim against Associates is
also not saved by the "deceptive" part of the
catchall provision. Deception, which is very similar
to fraud, is defined as "intentional misleading by
falsehood spoken or acted." Black's Law Dictionary
406 (6th ed.1990). An act or a practice is deceptive
or unfair if it has the capacity or tendency to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 166566 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

deceive. *Commonwealth ex rel. Zimmerman v. Nickel,* 26 Pa. D. & C.3d 115, 120 (Pa. D. & C.1983) *citing* FTC v. Raladam Company, 316 U.S. 149, 152, 62 S.Ct. 966, 968, 86 L.Ed. 1336 (1942); *see also In re Patterson,* 263 B.R. 82, 94 (Bankr.E.D.Pa.2001) (defining deceptive act as "act of intentionally giving a false impression or a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it"). Christopher has not asserted any facts which would lead to Associates' liability for deceptive conduct. As stated above, the only specific conduct he attributes to Associates is accepting more than the remaining principal on Christopher's loans when he refinanced. There were no representations and no contact between Christopher and Associates. Therefore, the overcharging also cannot constitute deception.

*4 Under the UTPCPL heading of his complaint, Christopher also asserts that Associates and the other defendants "imposed credit costs and charges expressly prohibited by Federal and Pennsylvania law, which is a *per se* unfair or deceptive practice." Christopher does not mention which charges by Associates were expressly prohibited. By omitting these facts, he has not adequately put the defendant on notice of the essential elements of the plaintiff's cause of action. I cannot credit his bald assertions of misconduct without any supporting facts. Thus, I will dismiss Christopher's UTPCPL claim with leave to amend if he can assert facts to give Associates notice of their alleged imposition of illegal charges.[FN4]

> FN4. Because Christopher has not offered any facts describing the charges, I cannot analyze whether his claim properly falls under UPTCPL. Upon cursory review, I doubt that he will be able to survive summary judgment on this claim without asserting any contact with Associates.

### 2. Count VI-Fraud

The heading of Count VI of Christopher's complaint states: "Fraud-All Defendants." In his response to

Associates' motion to dismiss, Christopher concedes that he has no fraud claim against Associates.[FN5] Therefore, I will dismiss the fraud claim against Associates.

> FN5. He states, "While plaintiff could have been clearer in the proofreading and final draft of the heading, Associates could not believed count VI was directed to it as each of the averments refer specifically to the loan broker."

### 3. Count VII-RESPA

Christopher also seems to assert a RESPA claim against Associates.[FN6] In this count, however, he only mentions the "lender" (presumably the original lender on each loan) and the loan broker (Kelly). Associates was merely assigned two of the loans; Christopher does not assert that they had any involvement in inducing him to enter into the loans. Therefore, I will dismiss the RESPA claim against Associates, again with leave to amend if Christopher can specify on what basis he seeks to hold Associates liable.

> FN6. In his response to Associates' motion to dismiss, he notes that "counts IV, V, and VII are directed to all defendants." Later in his response, however, Christopher argues that this court lacks jurisdiction over his claims against Associates because they are only state law claims. Even later in his response, he notes that subject matter jurisdiction is premised on the viability of the RESPA claim. As I discuss hereinafter, I have jurisdiction regardless of the survival of the RESPA claim because Christopher's claims against Associates form part of the same claim or controversy as his federal claims against First Mutual and Kelly.

### 4. Count IX-Breach of Contract

Christopher bases his breach of contract claim against Associates on his allegations that Associates

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 166566 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

demanded amounts in excess of that due under the mortgage and that the interest and finance charges in the loan held by Associates exceeded permissible amounts. Associates argues that Christopher's breach of contract claim is barred by the applicable statute of limitations.

"The failure of a party to a contract to perform in accordance with its terms gives the other party a cause of action for a breach." 1 P.L.E. CONTRACTS 491 (2005). In a contract case, a cause of action accrues when the breach occurs. *Romeo & Sons v. P.C. Yezbak & Son,* 539 Pa. 390, 652 A.2d 830. 832 (Pa.1995). Although Christopher does not specify which contract, or mortgage agreement, was breached by Associates, Christopher does assert that to satisfy both loans Associates received more than the principal. There are only two loans and I will give him the benefit of the doubt by assuming that he meant both loans that were eventually assigned to Associates. If Associates demanded more than the amount due to them under the mortgages, as Christopher asserts, then they breached the contracts. In this case, the alleged breach must have occurred at the time of closing, when the mortgage was extinguished. The 1997 loan closed on November 30, 1998. The 1998 loan closed on January 31, 2000.

The general statute of limitations for contract claims is four years. *See* 42 Pa. Cons.Stat. § 5525(a)(8). Pennsylvania, however, provides a twenty year statute of limitations for contracts under seal. 42 Pa. Cons.Stat. § 5529. "An instrument containing the word 'seal' or its equivalent is deemed a sealed instrument if the maker adopts the seal." *See Klein v. Reid,* 282 Pa.Super. 332, 422 A.2d 1143, 1144 (Pa.Super.1980). This presumption can be rebutted. *See id.; see also Federal Deposit Ins. Corp. v. Barness,* 484 F.Supp. 1134, 1149 n. 9 (E.D.Pa.1980) ("The presence of the printed word " (Seal)" opposite defendant's signature on the promissory note gives rise to only a rebuttable presumption that defendant adopted the seal, therby rendering the note a sealed instrument.").

**\*5** The 1998 mortgage contains the typed words " IN WITNESS WHEREOF, I hereunto set my hand and official seal." It also contains the word "seal" by each of the witness' signatures. Associates has not yet presented any evidence to rebut the presumption that the contract was not under seal. It was printed on the original documents; it was not later added by Christopher or a agent of First Mutual or Associates. The 1998 mortgage, therefore, was a contract under seal and subject to the twenty year statute of limitations.

Christopher has not asserted that the 1997 mortgage was a contract under seal, so any contract claims relating to that mortgage are time-barred. Therefore, I will dismiss any claims he has regarding the 1997 mortgage for statute of limitations purposes unless he asserts that they were executed under seal and thus fall under the longer statute of limitations.

In this section of the complaint, Christopher also asserts his rights to three times the amount of the excess charges paid, plus reasonable attorneys fees and costs, citing 41 Pa. Cons.Stat. §§ 502 and 503. These statutes prohibit usury and provide for a four year statute of limitations. *See* 41 Pa. Cons.Stat. § 502. As I discussed above, the date the alleged breach occurred was January 31, 2000. Christopher's cause of action for usury expired four years from that date, on January 31, 2004, and his complaint in this case was not filed until January 28, 2005. Therefore, any cause of action under 41 Pa. Cons.Stat. §§ 502 or 503 is dismissed with prejudice.

### 5. Jurisdiction

In his response, Christopher seems to contest this court's jurisdiction over his claims against Associates and asks that I remand the case to state court. If I dismiss the RESPA claim against Associates, Christopher argues, I must remand the remaining claims against Associates to state court. As 28 U.S.C. § 1367 provides:
[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6

Not Reported in F.Supp.2d, 2006 WL 166566 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

jurisdiction shall include claims that involve the joinder or intervention of additional parties.

The key question in these inquiries is whether the state and federal claims form a "common nucleus of operative fact." *See Lyon v. Whisman,* 45 F.3d 758, 760 (3d Cir.1995). As to this test, it has been stated that "mere tangential overlap of facts is insufficient, but total congruity between the operative facts ... is unnecessary." Nanavati v. Burdette Tomlin Memorial Hosp., 857 F.2d 96, 105 (3d Cir.1988).

Christopher's state claims meet this threshold. His federal claims against First Mutual and Kelly, under the Equal Credit Opportunity Act ("ECOA"), the Home Ownership Equity Protection Act ("HOEPA" ), the Real Estate Settlement Procedures Act (" RESPA"), all surround the four loans issued to Christopher, including their creation, terms, transfers, and satisfaction. Christopher's state claims, against First Mutual, Kelly, and Associates, are based on the same set of facts. Due to this substantial overlap, Christopher should not be expected to litigate and First Mutual and Kelly should not have to defend this action in two separate jurisdictions. The claims against Associates overlap the other claims against First Mutual and Kelly; three of the counts are directed concurrently to First Mutual, Kelly and Associates. Under § 1367, I also have jurisdiction over Christopher's state law claims against Associates. Therefore, I have jurisdiction over all of Christopher's federal and state claims.

*6 An appropriate order follows.

### ORDER

AND NOW, this 20th day of January 2006, upon consideration of defendant's motion to dismiss, Plaintiff's response, and defendant's reply thereto, and for the reasons set forth in the accompanying memorandum, defendant's motions to dismiss are denied as to Christopher's breach of contract claim against Associates based upon satisfaction of the 1998 mortgage. The defendants' motions to dismiss are GRANTED as to all other claims.

Plaintiff is granted leave to amend his Complaint within thirty days regarding his claims against Associates under UTPCPL, RESPA, and his breach of contract claim premised upon the 1997 mortgage. If plaintiff intends to assert a fraud claim under UTPCPL he must plead the elements of common law fraud. All other claims against Associates for which defendant's motions are granted are DISMISSED WITH PREJUDICE.

E.D.Pa.,2006.
Christopher v. First Mutual Corp.
Not Reported in F.Supp.2d, 2006 WL 166566 (E.D.Pa.)

END OF DOCUMENT                        .

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 2203724 (E.D.Pa.), 52 Collier Bankr.Cas.2d 1548
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Jones v. Aames Funding Corp.
E.D.Pa.,2004.

United States District Court,E.D. Pennsylvania.
Mary Ellen JONES, Arcieca Shepperd, Plaintiffs,
v.
AAMES FUNDING CORPORATION, et al.,
Defendants.
**No. Civ.A. 04-MC-119.**

Sept. 28, 2004.

Brian R. Mildenberg, Sherri J. Braunstein,
Mildenberg & Stalbaum PC, Philadelphia, PA, for
Plaintiff.
Barbara Kiely, Philadelphia, PA, Dean C. Waldt,
Ballard Spahr Andrews & Ingersoll, LLP,
Voorhees, NJ, for Defendants.

*MEMORANDUM AND ORDER*
DAVIS, J.

### I. INTRODUCTION

**\*1** Presently before the Court is the
Recommendation of the Honorable Bruce Fox,
United States Bankruptcy Judge, dated July 6, 2004
(Doc. No. 1). For the reasons that follow, it is
hereby ORDERED that the reference in this case is
WITHDRAWN.

### II. FACTUAL AND PROCEDURAL HISTORY

In or around September of 2001, Plaintiff Mary
Jones, an elderly low-income homeowner, contacted
Defendant Aames Funding Corporation, which is
licensed to do business in Pennsylvania as Aames
Home Loan ("Aames"), in an effort to refinance her
mortgage. Pl. Amend. Compl. at 5-6; Def. Aames
Funding Corp. Answer to Pl. Amend. Compl. at 2.
Aames allegedly advised Jones that consolidating

her debt and refinancing her mortgage with their
company would be financially advantageous. As a
result, Plaintiff decided to refinance her mortgage
with Aames. Pl. Amend. Compl. at 6. Plaintiff
Arcieca Shepperd co-signed the mortgage with her
mother. *Id.* Plaintiff Jones contends that Aames
delivered to her and Shepperd a substantially
different loan than was discussed in initial
conversations between the parties without her
knowledge or consent. Though Aames had
communicated to Plaintiffs that the refinancing
would result in a cash payment to them of $5,000,
Plaintiffs received only $2,000 from Defendants at
settlement. According to Plaintiffs, the HUD-1 form
states that Defendants disbursed $3,453.07 to
Plaintiffs at settlement and assessed them $6,407.73
in various loan-related fees. *Id.* at 6-7. In addition,
Plaintiff Jones contends that Aames made a
payment to her original mortgage company that
exceeded the principal balance on the mortgage by
$4,000 without her knowledge, an amount Plaintiff
assumes is a prepayment penalty. *Id.* at 6. Under the
terms of the Aames loan, Plaintiff, who lives on a
fixed monthly Social Security income of $579.40, is
required to make monthly payments of $550.43. *Id.*
at 8.

Defendant Countrywide Home Loans began
servicing the loan at some point in 2002, and
continues to do so. *Id.* at 7. Defendant Aames
assigned the mortgage to Defendant Bankers Trust
Company of CA, who securitized the loan into
Defendant Aames Trust, the current holder of the
loan. *Id.* at 10. On or about September 24, 2003,
Plaintiff Jones attempted to rescind the loan by
sending a letter to Defendants, who have failed to
respond to this request in any way. *Id.* at 12.
Plaintiff alleges that the predatory lending practices
engaged in by Defendants placed her in an
untenable financial position and proximately caused
her to file for Chapter 13 bankruptcy protection to
save her home. *Id.* at 10.

On March 3, 2004, Plaintiff Mary Jones filed an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 2

Not Reported in F.Supp.2d, 2004 WL 2203724 (E.D.Pa.), 52 Collier Bankr.Cas.2d 1548
**(Cite as: Not Reported in F.Supp.2d)**

adversary complaint against the various Defendants named above, claiming violations of the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA"), the Home Ownership and Equity Protection Act of 1994, 5 U.S.C. § 1639(a) et seq. ("HOEPA"), the Real Estate Settlement Procedures Act, 12 U.S.C. § 2501 et seq. ("RESPA"), the Equal Credit Opportunity Act, 15 U.S.C. § 1691(e) ("ECOA"), the Pennsylvania Fair Credit Extension Uniformity Act, 73 P.S. § 201-1 et seq., and common law breach of contract and fraud. Pl. Am. Compl. at 2. Plaintiff Sheppard joined the proceedings as co-mortgagor of the alleged predatory mortgage by way of the First Amended Complaint filed by Plaintiffs on May 18, 2004. Plaintiffs have demanded a trial by jury and seek damages and equitable and declaratory relief. *Id.* at 12-13, 14-15, 16, 18, 19-20, 22-23; 24-25. All Defendants have answered Plaintiff's Complaint, and have failed to object or consent to Plaintiff's request for a jury trial.

*2 On July 6, 2004, the Honorable Bruce Fox, United States Bankruptcy Judge, recommended that these proceedings be heard in district, rather than bankruptcy, court (Doc. No. 1). Applying Third Circuit precedent, Judge Fox found that Plaintiffs' claims are non-core claims. Recommend. at 3. Judge Fox further found that the bankruptcy court does not have subject matter jurisdiction over non-core claims unless all parties consent to that court's entry of a final judgment. *Id.* at 4. As Defendants have not consented to a jury trial by the bankruptcy court on these issues, Judge Fox recommended that this Court recognize the bankruptcy court's lack of jurisdiction and withdraw the reference. *Id.* at 4-5.

### III. STANDARD OF REVIEW

In reviewing a bankruptcy court's recommended findings, the district court applies "a clearly erroneous standard to findings of fact ... [and] a de novo standard of review to questions of law." *Berkery v. Comm'r, Internal Revenue Serv.,* 192 B.R. 835, 837 (E.D.Pa.1996) (citing, inter alia, *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir.1981)), *aff'd,* 111 F.3d 125, 1997 WL 169267 (1997). De novo review requires

the district court to make its own legal conclusions, "without deferential regard to those made by the bankruptcy court." *Fleet Consumer Discount Co. v. Graves (In re Graves),* 156 B.R. 949, 954 (E.D.Pa.1993), *aff'd,* 33 F.3d 242 (3d Cir.1994). The Supreme Court has held that a finding of fact, even if supported by evidence, is clearly erroneous " when ... the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Berkery,* 192 B.R., at 837 (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

### IV. DISCUSSION

Upon review, this Court agrees with Judge Fox's determination that Plaintiff's claims do not give rise to core bankruptcy proceedings. The Third Circuit considers a proceeding to be core under 28 U.S.C. § 157 "if it invokes a substantive right provided by Title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case. " *Torkelsen v. Maggio (In re Guild and Gallery Plus, Inc.),* 72 F.3d 1171, 1178 (3d Cir.1996) (quoting *In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 267 (3d Cir.1991)). A core proceeding " must have as its foundation the creation, recognition, or adjudication of rights which would not exist independent of a bankruptcy environment although of necessity there may be peripheral state law involvement." *Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc.,* 107 B.R. 34, 39 (D.Del.1989) (quoting *Acolyte Elec. Corp. v. City of New York,* 69 B.R. 155, 173 (Bankr.E.D.N.Y.1986)). Here, Plaintiffs raise various federal and state statutory and common law claims against Defendants based on the pre-petition issuance of and collection on an allegedly predatory mortgage. These are not claims that arise from a substantive right provided by federal bankruptcy law, nor are they claims that only arise in the context of a bankruptcy proceeding. *See e.g., Beard v. Braunstein,* 914 F.2d 434, 443 (3d Cir.1990) (stating that suit for pre-petition contract damages is non-core); In re Derienzo, 254 B.R. 334, 338 (M.D.Pa.2000) (holding that claimed violations of TILA and Pennsylvania consumer protection laws were non-core); *In re Second Pine, Inc.,* 107 B.R.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 3

Not Reported in F.Supp.2d, 2004 WL 2203724 (E.D.Pa.), 52 Collier Bankr.Cas.2d 1548
**(Cite as: Not Reported in F.Supp.2d)**

48, 49 (E.D.Pa.1989) (stating that fraudulent
misrepresentation claim based on pre-petition
representations and reliance was non-core). Because
each of these claims can be brought independent
from the bankruptcy proceedings and can be
adjudicated according to state and federal laws
without reference to the Bankruptcy Code, they are
non-core.

*3 This Court also agrees with Judge Fox's finding
that Plaintiffs' demand for and Defendants' refusal
to consent to a jury trial removes this adversary
proceeding from the bankruptcy court's jurisdiction.
The Third Circuit has held that "a bankruptcy court
cannot conduct a jury trial in a non-core proceeding.
" *Beard,* 914 F.2d at 443. Section 157 states that
only the district court can enter a final judgment or
order in a non-core matter heard by the bankruptcy
court. The bankruptcy court is limited to issuing
proposed findings of fact and law and the district
court has the power to conduct a de novo review of
any matter timely and specifically objected to by the
parties. 28 U.S.C. § 157(c)(1). The Third Circuit's
holding in *Beard* is premised on the conflict
between section 157(c)'s limitation on the
bankruptcy court's ability to render a final judgment
in non-core matters and the Seventh Amendment's
guarantee that "no fact tried by a jury shall be
otherwise reexamined in any Court of the United
States, than according to the rules of the common
law." *Id.* Were a fact to be found by a jury in a
non-core proceeding in bankruptcy court, that fact
is potentially reviewable de novo by the district
court, a situation that is incompatible with the
Seventh Amendment.

In *Beard,* however, the Third Circuit indicated that
a bankruptcy judge could conduct a jury trial in a
non-core proceeding so long as it had the consent of
all parties. *Id.* n. 14. Consent may be implied, but "a
court should not lightly infer from a litigant's
conduct consent to have private state-created rights
adjudicated by a non-Article III bankruptcy judge."
In re Derienzo, 254 B.R. at 339 (quoting *In re
Pioneer Inv. Servs. Co.,* 946 F.2d 445, 449 (6th
Cir.1991)). Plaintiffs have demanded a jury trial in
the bankruptcy court on non-core matters. There is
nothing in the record that suggests that Defendants
have explicitly consented to a jury trial in the

bankruptcy court. In addition, Defendants could
have objected to the bankruptcy court's July 6, 2004
recommendation for withdrawal, thereby expressly
or implicitly consenting to the bankruptcy court's
issuance of a final judgement on these matters.
Defendants did not do so. As such, the bankruptcy
court lacks jurisdiction over these proceedings, and
the reference must be withdrawn pursuant to 28
U.S.C. § 157(d).

                    V. CONCLUSION

For all these reasons, the Recommendation of the
Honorable Bruce Fox, United States Bankruptcy
Judge, dated July 6, 2004 (Doc. No.1) is
ACCEPTED and the reference in this case is
WITHDRAWN. An appropriate order follows.

E.D.Pa.,2004.
Jones v. Aames Funding Corp.
Not Reported in F.Supp.2d, 2004 WL 2203724
(E.D.Pa.), 52 Collier Bankr.Cas.2d 1548

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw Attached Printing Summary Report for HORAN,JOHN 5631214

| | |
|---|---|
| Date/Time of Request: | Friday, June 08, 2007 09:24:00 Central |
| Client Identifier: | Q |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 830 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Levin v. Upper Makefield Tp.
E.D.Pa.,2003.
Only the Westlaw citation is currently available.
    United States District Court, E.D. Pennsylvania.
        BENNETT LEVIN, Plaintiff,
                    v.
    UPPER MAKEFIELD TOWNSHIP, et al.,
                Defendants.
        **No. CIV.A. 99-CV-5313.**

            Feb. 25, 2003.

Landowner sued township and zoning hearing
board, claiming that his substantive due process
rights, and his rights under state law, were violated
by their denial of permit to build house in flood
plain, township's appeals of court order that permit
be granted, and township's delays in granting of
permit. Defendants moved for summary judgment.
The District Court, Davis, J., held that: (1)
substantive due process rights of landowner were
not violated; (2) court would assert supplemental
jurisdiction over state claims; (3) township did not
abuse process; and (4) defendants did not engaged
in civil conspiracy.

Judgment for defendants.
West Headnotes
**[1] Constitutional Law 92 ☜4093**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G)    Particular    Issues    and
Applications
            92XXVII(G)3 Property in General
                92k4091 Zoning and Land Use
                    92k4093 k. Particular Issues and
Applications. Most Cited Cases
        (Formerly 92k278.2(1))

**Zoning and Planning 414 ☜385**

414 Zoning and Planning

        414VIII Permits, Certificates and Approvals
            414VIII(A) In General
                414k384 Nature of Particular Structures or
Uses
                    414k385    k.    Architectural    and
Structural Designs. Most Cited Cases
Landowner was not deprived of protected liberty
interest, as basis for claim that his substantive due
process rights were violated, when township and
zoning hearing board allegedly wrongfully denied
permit for construction of home on flood plain; only
property rights were affected by challenged actions.
U.S.C.A. Const.Amend. 14.

**[2] Constitutional Law 92 ☜4093**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G)    Particular    Issues    and
Applications
            92XXVII(G)3 Property in General
                92k4091 Zoning and Land Use
                    92k4093 k. Particular Issues and
Applications. Most Cited Cases
        (Formerly 92k278.2(1))

**Zoning and Planning 414 ☜385**

414 Zoning and Planning
    414VIII Permits, Certificates and Approvals
        414VIII(A) In General
            414k384 Nature of Particular Structures or
Uses
                414k385    k.    Architectural    and
Structural Designs. Most Cited Cases
Zoning hearing board, and township officials, took
action impinging upon landowner's property rights,
which were subject to substantive due process
protection, when board rejected landowner's
application to build house on flood plain property,
and officials decided to oppose landowner's appeal
of decision. U.S.C.A. Const.Amend. 14.

**[3] Constitutional Law 92 ☜4093**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 2

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G)    Particular    Issues    and
Applications
            92XXVII(G)3 Property in General
                92k4091 Zoning and Land Use
                    92k4093  k.  Particular  Issues  and
Applications. Most Cited Cases
    (Formerly 92k278.2(1))

**Zoning and Planning 414 ☞385**

414 Zoning and Planning
    414VIII Permits, Certificates and Approvals
        414VIII(A) In General
            414k384 Nature of Particular Structures or
Uses
                414k385    k.    Architectural    and
Structural Designs. Most Cited Cases
Township officials, and zoning hearing board, did
not engage in conduct shocking to conscience, as
required for claim that they violated substantive due
process rights of landowner by wrongfully denying
and hindering issuance of zoning permit allowing
construction of house on flood plain; initial
opposition was based on legitimate safety concerns,
and later delaying tactics, while objectionable, were
insufficiently egregious. U.S.C.A. Const.Amend. 14

**[4] Federal Courts 170B ☞18**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk14    Jurisdiction    of    Entire
Controversy; Pendent Jurisdiction
                170Bk18  k.  Validity  or  Substantiality
of Federal Claims and Disposition Thereof. Most
Cited Cases
Federal    court    would    exercise    supplemental
jurisdiction,   over   state   law   claims   made   by
landowner against township and zoning hearing
board alleging wrongful opposition to zoning
permit request to build house on flood plain,
following dismissal of federal claims after suit was
40 months old. 28 U.S.C.A. § 1367.

**[5] Process 313 ☞168**

313 Process
    313IV Abuse of Process
        313k168  k.  Nature and Elements of Cause of
Action. Most Cited Cases
Township    did    not    abuse    process,    under
Pennsylvania   law,   when   it   appealed   to
Commonwealth Court order of Court of Common
Pleas that it issue permit for construction of house
in flood plain, and when it sought review of
affirmance by state Supreme Court; there was no
use of process for any illegitimate purpose, or act
not authorized by process.

**[6] Conspiracy 91 ☞1.1**

91 Conspiracy
    91I Civil Liability
        91I(A)  Acts  Constituting  Conspiracy  and
Liability Therefor
            91k1 Nature and Elements in General
                91k1.1 k. In General. Most Cited Cases
Township officials and zoning hearing board did
not engage in civil conspiracy, under Pennsylvania
law, by allegedly cooperating to denying permit for
construction of house in flood plain, for purpose of
preserving open space; conspiracy claim required
underlying tort as predicate, and all tort claims had
been dismissed.

*MEMORANDUM AND ORDER*

DAVIS.

*MEMORANDUM*

I. *FACTUAL BACKGROUND*

*1 In June 1997, Bennett Levin ("Plaintiff")
contemplated purchasing approximately seven acres
of unimproved land ("Property") in Upper
Makefield Township ("Township") to construct a
single-family dwelling. The Property is flanked by
the Delaware River ("River") on one side, and the
Delaware Division of the Pennsylvania Canal ("
Canal") on the other, and zoned within the
Conservation Management Zoning District ("CM")
and the Floodplain Zoning District ("Floodplain").
After   a   preliminary   investigation,   Plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

discovered that a zoning variance was required from the Township before building on the Property, and the prior property owner, Marvin C. Soffen, applied for and was denied a zoning variance on the same property in 1992 (P. Resp., ex. 47 at p. 4). Shortly thereafter, Plaintiff purchased the Property from Mr. Soffen for $60,000 (P. Resp., ex. 55).

On November 24, 1997, Plaintiff submitted a zoning variance application ("Application"),[FN1] which included a request for a hearing before the Zoning Hearing Board ("ZHB").[FN2] On December 17, 1997, the Township held a public meeting, and the Supervisors made a motion authorizing the Solicitor to oppose Plaintiff's Application (P. Resp., ex. 53 at p. 4). Stephen Harris, through his law firm Harris & Harris, personified the Solicitor.

> FN1. The Joint Municipal Zoning Ordinance ("JMZO"), Article IX, Exhibit B, specifically details the procedures for an applicant requesting a special exception or variance from the requirements of the " Floodplain District." Plaintiff's Application irrefragably complied with these procedures, while Mr. Soffen's did not (P. Resp., ex. 47 at p. 3, 536 A.2d 1337).

> FN2. The Township does not grant or deny variance applications-this is the ZHB's function. Rather, the Township, through the Board of Supervisors ("Supervisors"), reviews variance applications and decides whether to give the Township Solicitor (" Solicitor") authorization to represent the Township's position before the ZHB. The Township may be for or against a variance application, or take no stance at all, in which case the Solicitor is not endorsed to go before the ZHB on the Township's behalf. 53 Pa. Cons.Stat. Ann. § 10909.1.

The December 17, 1997 meeting was the first time that many of the Supervisors actually saw Plaintiff's Application, and none claimed to have previously read it (P. Resp., ex. 19 at p. 96-97; ex. 22 at p. 12; ex. 24 at p. 8; ex. 27 at p. 24).[FN3] The motion by the Supervisors to authorize the Solicitor to

represent the Township's interest in opposition to the Plaintiff's Application was carried (P. Resp., ex. 53 at p. 4).[FN4] The Supervisors' votes reflected their individual concerns as to: (i) the safety of the inhabitants in Plaintiff's proposed home, and the safety of all subsequent purchasers (D. Motion, ex. 18 at p. 117-18); (ii) the safety of emergency personnel that might be required to rescue the inhabitants under parlous flood conditions (D. Motion, ex. 14 at p. 28-29, 58); and (iii) the environmental effect of potential sewage up-rise from the proposed on-site sewage system (D. Motion, ex. 18 at p. 157; ex. 19 at p. 107; ex. 14 at p. 58).

> FN3. Plaintiff was not given notice of the December 17, 1997 meeting, and neither Plaintiff nor his representative attended (P. Resp., ex. 16 at p. 3, 536 A.2d 1337).

> FN4. The composition of the Board of Supervisors changed on January 5, 1998, and two new members, Edward Ford and John Titterton, replaced two exiting members, Lawrence Saltzman and John Welsh. The new slate of Supervisors, Rosemarie Sauter, Conrad Baldwin, William Gunser, Edward Ford, and John Titterton, held another vote on the Plaintiff's Application on January 21, 1998, yielding the same result as the December 17, 1997 vote (P. Resp., ex. 54 at p. 4-5, 536 A.2d 1337).

Thereafter, the ZHB held eight separate evidentiary hearings before rendering a decision on the Application.[FN5] At a public hearing on July 30, 1998, the ZHB held that Plaintiff's Application did not meet the requirements of the Municipalities Planning Code ("MPC"), and rejected the Application by a unanimous 3-0 vote (P. Resp., ex. 13 at p. 2-7).

> FN5. The evidentiary hearings were held on January 29, 1998, March 3, 1998, March 19, 1998, March 31, 1998, April 9, 1998, May 12, 1998, June 2, 1998, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 4

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

June 23, 1998.

On September 9, 1998, Plaintiff filed a land-use appeal with the Court of Common Pleas, Bucks County, Pennsylvania, and on October 7, 1998, the Supervisors voted in favor of authorizing Mr. Harris to represent the Township in the appeal before the Court of Common Pleas (D. Motion, ex. 42 at p. 10). On February 23, 1999, Common Pleas Judge John J. Rufe issued a Memorandum Opinion and Order reversing the ZHB and granting Plaintiff's Application for a zoning variance. *Bennett Levin v. Zoning Hearing Board of Upper Makefield Township,* Memorandum Opinion and Order (C.C.P. Bucks Cty. February 23, 1999) (Rufe, J.). On May 7, 1999, Judge Rufe issued a second Opinion further establishing the reasoning of his February 23, 1999 initial Memorandum and Order. *Bennett Levin v. Zoning Hearing Board of Upper Makefield Township,* Opinion (C.C.P Bucks Cty. May 9, 1999)(Rufe, J.).

**\*2** On March 3, 1999, after consideration of Judge Rufe's February 23, 1999 Memorandum Opinion and Order, the Supervisors voted to empower Mr. Harris to file an appeal, on the Township's behalf, to the Commonwealth Court of Pennsylvania (D. Motion, ex. 46 at p. 7). In an unpublished opinion by Judge Flaherty, the Commonwealth Court affirmed Judge Rufe's Opinion reversing the ZHB's decision to reject Plaintiff's Application. *Bennett Levin v. Zoning Hearing Board of Upper Makefield Township,* Memorandum Opinion (Pa. Commw. May 11, 2000)(Flaherty, J.).

On May 17, 2000, six days after the Commonwealth Court affirmed Judge Rufe's decision, the Supervisors pondered instituting a change to the Canal Setback Ordinance ("Ordinance"), thereby requiring a 100-foot building setback along the Canal (P. Resp., ex. 50 at p. 7). The Ordinance would have severely limited Plaintiff's ability to develop the Property, and would have required another zoning variance. At the November 1, 2000 Upper Makefield Township Board of Supervisors Meeting, 140 members of the general public, most being directly affected by the potential implications of the Ordinance, came to express their outrage (P. Resp., ex. 51 at p. 1-3).[FN6] Under harsh public

scrutiny, the Supervisors abandoned the Ordinance (P. Resp., ex. 51 at p. 2).[FN7]

> FN6. The October 18, 2000 Upper Makefield Township Board of Supervisors Meeting, which immediately preceded the November 1, 2000 meeting, was only attended by 21 members of the public (P. Resp., ex. 52 at p. 1, 536 A.2d 1337).

> FN7. After the November 1, 2000 meeting, Supervisor Edward Ford, privately told Richard Pushman, a resident whose home borders the Canal, that the Ordinance was not intended to impact those residents already living on the Canal, but rather the intention was to protect the Canal region from new development. Mr. Pushman knew that Plaintiff's Property was the only potential new development bordering the Canal (P. Resp., ex. 48 at p. 2, 536 A.2d 1337).

On May 24, 2000, Plaintiff, through his engineer J.G. Park & Associates, Inc., submitted a zoning permit application, a foundation construction permit application, a construction cost estimate, plans for the proposed single-family residence, and plans for the foundation of the proposed single-family residence (P. Resp., ex. 66). Plaintiff paid $2,300 for the foundation building permit (P. Resp., ex. 68).

On June 12, 2000, Mr. Harris filed a Petition for Allowance of Appeal, on behalf of the Township, with the Supreme Court of Pennsylvania. The Township, through Mr. Harris, also notified Plaintiff that it would not issue the foundation or zoning permits until the Supreme Court ruled on the pending appeal. Plaintiff filed for a grading permit on August 23, 2000 (P. Resp., ex. 67), and again was told by the Township that no permits would be issued until the appeal pending before the Pennsylvania Supreme Court was resolved (P. Resp., ex. 49 at p. 2). The Township cashed Plaintiff's $2,300 check before the Supreme Court decided the appeal and before the Township issued any of the permits (P. Resp., ex. 68). On November 9, 2000, the Supreme Court denied allocatur.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 5

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

The Plaintiff was not issued a foundation permit until November 2001, and a final building permit until February 5, 2002-almost a year-and-a-half after the Supreme Court denied allocatur (P. Resp., ex. 16 at p. 3). In late-January 2002, the Township required Plaintiff to produce proof of workers' compensation insurance, to complete a "Notice of Intent to Construct and Comply" ("Form"), and to provide the results of a well water test, before issuing the final building permit. Plaintiff contends he need not have workers' compensation insurance, there is no mention of the Form in the Township permit application, and a water well test was already submitted with Plaintiff's original zoning variance application dated November 24, 1997 (P. Resp., ex. 70 at p. 2). Nevertheless, Plaintiff satisfied all of the Township's requests, and was issued a final building permit on February 5, 2002, notwithstanding that Plaintiff's architectural and structural drawings were approved on November 7, 2001 (P. Resp., ex. 70 at p. 2).

## I. PROCEDURAL HISTORY

**\*3** Plaintiff commenced this case by filing a Complaint in the United States District Court for the Eastern District of Pennsylvania (Document No. 1, filed October 26, 1999). Thereafter, Plaintiff filed an Amended Complaint (Document No. 20, filed September 18, 2000), and Defendants' made a Motion to Dismiss the Amended Complaint pursuant to Fed. R. Civ. P 12(b)(6) (Document No. 21, filed October 4, 2000). Defendants' Motion to Dismiss Plaintiff's Amended Complaint was granted in part and denied in part (Document No. 29, filed May 10, 2001), and the following claims remain in this Court: [FN8] (i) compensatory damages, punitive damages, attorneys' fees, and equitable relief for violation of Plaintiff's substantive due process rights pursuant to the Civil Rights Act, 42 U.S.C. § 1983, against the Township, all members of the Board of Supervisors in their individual and official capacities, all members of the ZHB in their individual and official capacity, and the Solicitors, in their individual and official capacities; (ii) compensatory and punitive damages for civil conspiracy against the Township, all members of the Board of Supervisors in their individual and

official capacities, the members of the ZHB in their individual and official capacities, and the Solicitors, in their individual and official capacity; and (iii) compensatory and punitive damages for abuse of process against the Township, all members of the Board of Supervisors in their individual and official capacities, and the Solicitors, in their individual and official capacities.

> FN8. By Order, this case was reassigned to the calendar of the Honorable Legrome D. Davis (Document No. 56, filed May 23, 2002).

Presently before this court are: (i) Defendants' Motion for Summary Judgment on the aforementioned claims (Document No. 51, filed March 29, 2002); (ii) Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Document No. 53, filed April 12, 2002); (iii) Defendants' Reply in Support of Defendants' Motion for Summary Judgment (Document No. 54, filed April 26, 2002); (iv) Plaintiff's Supplemental Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Document No. 59, filed February 10, 2003); and (v) Defendants' Supplemental Memorandum of Law in Support of their Motion for Summary Judgment (Document No. 60, filed February 10, 2003). [FN9]

> FN9. This Court is in receipt of Plaintiff's May 14, 2002 letter requesting permission to submit the Supplemental Declaration of Edward F. Murphy, Esquire, and Defendants' February 19, 2003 letter requesting permission to submit the Declaration of Stephen B Harris, Esquire. Rule 408 of the Federal Rules of Evidence states that settlements or attempts to settle are "not admissible to prove liability or invalidity of the claim or its amount." Additionally, "[e]vidence of conduct or statements made in compromise negotiations is likewise not admissible." Both requests are denied. Any references to the December 1, 1999 or April 13, 2001 settlement conferences will not be

considered by this Court.

## III. *DISCUSSION*

*4 This Court exercises subject matter jurisdiction over the substantive due process claim pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343. *Examining Bd. of Eng'rs., Architects & Surveyors v. Otero,* 426 U.S. 572, 583-84, 96 S.Ct. 2264, 2272, 49 L.Ed.2d 65 (1976). Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Upon a motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). An issue is genuine if the evidence is such that a reasonable jury could return a judgment in favor of the non-moving party. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Borough of West Chester, Pa.,* 891 F.2d 458, 459 (3d Cir.1989). Lastly, all facts must be viewed in the light most favorable to the non-moving party, and all reasonable inferences should be drawn from the evidence presented by the non-moving party. *Anderson,* 477 U.S. at 255; *Gass v. Virgin Islands Telephone Corp.,* 311 F.3d 237, 240 (3d Cir.2002).

### A. Substantive Due Process

Defendants' qualified immunity defense prompts this Court to make a two-part inquiry: (i) whether the Plaintiff has successfully alleged a deprivation of a constitutional right; and (ii) whether the deprived right was clearly established at the time of the suspect event. *County of Sacramento v. Lewis,* 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998); *Eddy v. Virgin Islands Water and Power Auth.,* 256 F.3d 204, 208 (3d Cir.2001). As a result, this Court must first resolve whether the Plaintiff has alleged a deprivation of a constitutional right. Only after affirmatively

answering this initial inquiry is it necessary to consider whether the deprived right was clearly established at the time of the suspect event. *See, e.g., Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991)("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is clearly established at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."); *Nicholas v. Pennsylvania State University,* 227 F.3d 133, 139-40 (3d Cir.2000)("To prevail on a non-legislative substantive due process claim, a plaintiff must establish as a threshold matter that he has a protected property [or liberty] interest to which the Fourteenth Amendment's due process protection applies.") (citation omitted).

A substantive due process claim is actionable under 42 U.S.C. § 1983. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990). A successful substantive due process challenge to an executive act [FN10] requires the Plaintiff to prove: (i) an interest protected by the Fourteenth Amendment's Due Process Clause; and (ii) the government's deprivation of that protected interest "shocks-the-conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 846-47, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043 (1998); *United Artists Theatre Circuit, Inc. v. The Township of Warrington, PA.,* 316 F.3d 392, 400 (3d Cir.2003). Therefore, this Court will first analyze whether the Plaintiff has an interest protected by the Fourteenth Amendment's Due Process Clause.

> FN10. The determination of what constitutes arbitrary action, and hence the legal standard for an alleged substantive due process violation, differs depending on whether the alleged violation is by a legislative or executive action. *See Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (legislative action); *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)(executive action).

*5 The Fourteenth Amendment mandates that "no

Not Reported in F.Supp.2d                                    Page 7

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Due Process Clause's procedural protections are complemented by a substantive component-thereby affording more than fair process alone. *Washington v. Glucksberg,* 521 U.S. 702, 719, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997). The substantive sphere bars " certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); *Hunterson v. Disabato,* 308 F.3d 236, 248 (3d Cir.2002). Most significantly, substantive due process protects fundamental liberty and property interests.

### 1. Fundamental Interests

#### i. Protected Liberty Interests[FN11]

> FN11. In Plaintiff's Amended Complaint he asserted a substantive due process claim based upon the violation of a protected liberty interest. This theory was explicitly abandoned in Plaintiff's Opposition to Defendants' Motion for Summary Judgment (P. Resp. at p. 81, n. 33), but this Court will nevertheless give the alleged protected liberty interest a cursory review.

[1] Traditionally, substantive due process protects only the most fundamental liberty interests, *see, e.g., Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (right to use contraception and to marital privacy); *Doe v. Delie,* 257 F.3d 309, 317, n. 5 (3d Cir.2001)(same); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)(right to decide to terminate a pregnancy, absent undue state interference); *Planned Parenthood of Central New Jersey v. Farmer,* 220 F.3d 127, 142 (3d Cir.2000)(same); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967)(right to marriage); *Murillo v. Bambrick,* 681 F.2d 898, 902 (3d Cir.1982)(same); *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1976)(right to live with

extended family); *Lutz v. City of York, Pa.,* 899 F.2d 255, 267 (3d Cir.1990)(same); *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)(right of parents to decide care and control of their children); *McComb v. Wambaugh,* 934 F.2d 474, 483 (3d Cir.1991)(same), [FN12] and the Supreme Court is reluctant to further expand the scope of protected liberties unless the right is perceived to be "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Synder v. Com. of Mass.,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934), *overruled on other grounds by Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Lutz,* 899 F.2d at 268. *See also Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). In *Glucksberg,* the Supreme Court of the United States cautioned that, "[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field.' " 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (quoting *Collins,* 503 U.S. at 125); *Phillips v. Borough of Keyport,* 107 F.3d 164, 186 (3d Cir.1997).

> FN12. This list is not exhaustive, and only reflects a sampling of rights protected under the umbrella of substantive due process.

With these judicial policies in mind, this Court will generally tread lightly in the realm of unexplored liberty interests. Liberty interests are typically limited to fundamental rights of the persons, such as family rights, procreation, and the right to bodily integrity. Pecuniary and monetary entitlements, in general, will not be classified as liberty interests worthy of substantive due process protection. The Plaintiff stated that he believes the Defendants violated a protected liberty interest by interfering with his, "right to undisturbed, quiet enjoyment of private property, the right to engage in the valuable use of one's property and the right not [to] have the value of one's property diminished by arbitrary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 8

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

government action." (D. Motion, ex. 53 at p. 11). While every individual should be afforded the rights and protections that Plaintiff demands, it is altogether different to suggest that these rights should be structured as *liberty* interests under substantive due process law. Some of Plaintiff's alleged rights fall under the rubric of protected *property* interests, and others are more appropriately sheltered by the Takings Clause. US CONST. amend. V. The Plaintiff has not asserted that a government actor encroached upon an established liberty interest in violation of Plaintiff's substantive due process rights, and since our " Nation's history, legal tradition, and practices," *Collins,* 503 U.S. at 125, do not suggest that this Court should craft a new, groundbreaking, and potentially far-reaching protected liberty interest, we see no reason to give further consideration to this particular claim.

### ii. Protected Property Interests

*6 [2] Procedural due process protects a broad scope of property rights, and interests often harbored by procedural due process receive disparate substantive due process treatment. *See Mauriello v. U. of Med. & Dentistry of N.J.,* 781 F.2d 46, 50 (3d Cir.1986); *DeBlasio v. Zoning Bd. of Adjustment for the Township of W. Amwell,* 53 F.3d 592, 599 (3d Cir.1995), *cert. denied,* 516 U.S. 937, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995), *overruled on other grounds by United Artists Theatre Circuit, Inc. v. Township of Warrington, PA.,* 316 F.3d 392 (3d Cir.2003). Analogous to a substantive due process analysis based upon a fundamental liberty interest, a fundamental property interest claim must originate from an "interest encompassed by the Fourteenth Amendment." *Acierno v. Cloutier,* 40 F.3d 597, 616 (3d Cir.1994) (citation omitted). However, the Supreme Court noted that:
property interests ... are not *created* by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source.

*Board of Regents v. Roth,* 408 U.S. 564, 577, 92

S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)(emphasis added). Generally, state and local laws function as the independent sources, thereby creating property interests potentially deserving of substantive due process protection.

Applying this rationale, the Third Circuit in *DeBlasio* explicitly held that, "ownership is a property interest worthy of substantive due process protection," and that "one would be hard-pressed to find a property interest more worthy of ... protection than ownership." 53 F.3d at 600-01. Specifically, the Third Circuit stated that land ownership will be protected by substantive due process where a governmental decision "impinges upon a landowner's use and enjoyment of property." *Id.* As a Third Circuit land-use regulation case, *DeBlasio* is directly on point for this specific matter on this particular issue.[FN13]

> FN13. *DeBlasio* was abrogated on other grounds, and is only controlling as a land-use regulation case that established a fundamental property interest protected by substantive due process where a governmental decision restricts or regulates a landowner's use and enjoyment of his/her property.

*7 It is undisputed that: (i) Plaintiff is the owner of the Property; [FN14] and (ii) the ZHB, by denying Plaintiff's Application, made a decision impinging upon Plaintiff's use and enjoyment of the Property. Therefore, as between the Plaintiff and the ZHB, Plaintiff has clearly established a property interest entitled to substantive due process protection. Defendants allege that the ZHB made the only " decision" to limit Plaintiff's use and enjoyment of his Property, and that the Supervisors and Solicitors (D. Motion, at p. 35) should be dismissed from the substantive due process claim. We find Defendants' position to be narrow and unpersuasive.

> FN14. *Neiderhiser v. Borough of Berwick,* 840 F.2d 213 (3d Cir.1988), suggests that when a lessor is denied a variance from a local ordinance, the *lessor* would also be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

afforded the same substantive due process protections as the actual *owner* of the leased property.

The decisions made by the Supervisors, Solicitors, and the ZHB were harmonious and complementary. This is exemplified by the Township's appeals process. The ZHB issued an opinion denying Plaintiff's Application, and Plaintiff appealed the decision to the Court of Common Pleas. From this point on, the ZHB had no influence or affect on the Plaintiff's Application. The ZHB did not represent itself in the appeal to the Court of Common Pleas, and *it* did not vote to authorize a third-party to represent the ZHB's position. As a result of this procedure, logic suggests that some other party must decide whether to appeal or oppose an appeal, lest the ZHB's decisions would have no force, as every appeal from the ZHB would be unopposed in the Court of Common Pleas. The Township's procedure requires the Supervisors to make all appeals decisions by authorizing the Supervisors to dictate whether the Solicitor should represent the ZHB's ruling in front of the Court of Common Pleas. There is no argument that the Township is irrefutably entitled to appeal any case that it sees fit for further consideration, but if the Township, through the Supervisors and the Solicitor, is inescapably intertwined in the ZHB's appeals process, then in reality all three entities, the ZHB, the Supervisors, and the Solicitor, are speaking uniformly with one voice. Accordingly, we hold that Plaintiff has established a property interest deserving of substantive due process protection.

### 2. "Shocks the Conscience"

[3] The second prong of a substantive due process challenge to an executive act requires the Plaintiff to prove that the deprivation of a constitutionally protected property interest "shocks-the-conscience." *Lewis,* 523 U.S. at 846-47; *United Artists,* 316 F.3d at 400. The Supreme Court recognized that "with abusive executive action ... only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,' " *Lewis,* 523 U.S. at 846, (quoting *Collins,* 503 U.S. at 129), and that the cognizable level of executive abuse of power is

measured against that which shocks-the-conscience.

Before the Supreme Court's decision in *Lewis* and for a short time thereafter, the Third Circuit applied the improper motive test to substantive due process claims in land-use regulation cases.[FN15] For example, in *Bello v. Walker,* 840 F.2d 1124, 1129 (3d Cir.1987), *overruled by United Artists,* 316 F.3d 392, the Third Circuit held that a meritorious substantive due process claim against municipal officials in a land-use regulation case required the Plaintiff to prove that the officials' decision to deprive the Plaintiff of a property interest afforded substantive due process protection under the Fourteenth Amendment was arbitrary, irrational, or tainted by improper motive. *See also Pace Resources Inc. v. Shrewsbury Tp.,* 808 F.2d 1023, 1035 (3d Cir.1987). Similarly, in *Woodwind Estates,* a developer sued the township for denying the developer's subdivision plans for low-incoming housing. The court held that the Plaintiff developer could provide the jury with evidence that the township's decision to withhold approval of the plans was arbitrary, irrational, or based upon improper motive, and that summary judgment on the substantive due process claim in favor of the township was inappropriate. 205 F.3d 118 (3d Cir.2000), *overruled by United Artists,* 316 F.3d 392

> FN15. *Lewis* addressed the substantive due process culpability of a law enforcement officer for "causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender," 523 U.S. at 836, and therefore could conceivably be distinguishable from other species of substantive due process claims. *See, e.g., Woodwind Estates Ltd. v. Gretowski,* 205 F.3d 118 (3d Cir.2000).

*8 Recently, in *United Artists* the Third Circuit clarified its standard and definitively applied the shocks-the-conscience test to all executive substantive due process claims, while simultaneously overruling *Bello* and its progeny. The Third Circuit stated that its previous land-use

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 10

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

regulations rulings are irreconcilable with the Supreme Court's substantive due process analysis under *Lewis,* and that the "less demanding improper motive test for governmental behavior," is no longer applicable. *United Artists,* 316 F.3d at 400. The Third Circuit reinforced the stark contrast between the improper motive and shocks-the-conscience standards by noting that, "the term 'improper' sweeps much more broadly, and neither *Bello* nor the cases that it spawned ever suggest that conduct could be 'improper' only if it shocked the conscience." *Id.*

The implications and levity of this elevated standard are clear, but the Supreme Court has not provided a precise formula for determining what actions specifically constitute conscience shocking behavior. *See Lewis,* 523 U.S. at 847 ("the measure of what is conscience shocking is no calibrated yard stick."). We are only guided by rough contours. *See, e.g., Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 410, 1 L.Ed.2d 448 (1957) (behavior that shocks the conscience is so "brutal and offensive that it [does] not comport with traditional ideas of fair play and decency."); *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987)( "conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.")(quotation and citation omitted); *Lewis,* 523 U.S. at 849 ("conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." ). Additionally, the force and veracity of the shocks-the-conscience standard is versatile and adaptable, metamorphosing to the particular factual situation, *see, e.g., Lewis,* 523 U.S. at 850 (" Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."); *Betts v. Brady,* 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595 (1942)("That which may, in one setting constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in light of other consideration,

fall short of such denial."), and as a result of the nature of the standard, its application is not an exacting science. For example, in *Whitley v. Albers,* the Supreme Court held that acts of "deliberate indifference" could not accurately measure whether an officer's behavior in a prison riot amounted to shocking-the-conscience because in this setting it is inappropriate "to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance," 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)(emphasis added), and that a lesser standard was more appropriate. On the contrary, the Supreme Court in *Lewis,* 523 U.S. at 850, noted that the actions in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), exhibited a deliberate indifference to the prisoner's medical needs and would shock-the-conscience since the prison officials had the opportunity to exercise forethought over the inmate's well-being.

The Supervisors decision to oppose Plaintiff's Application, the ZHB's decision to deny Plaintiff's zoning variance Application, and the Supervisors' and Solicitor's subsequent decisions pursuant to the Plaintiff's appeal to the Court of Common Pleas, were not arbitrary in such a manner as to be constitutionally characterized as shocking-the-conscience. On the contrary, the ZHB's opinion is plainly based upon the applicable zoning variance statutes: the Conservation Management Zoning District, the overlay of Floodplain Zoning District § 905, and the five-pronged test under the Municipalities Planning Code § 10910.2, and although this Court will not substantively address whether the ZHB properly applied each of these three governing sets of laws to the Plaintiff's Application, the ZHB's conclusions of law, right or wrong, do not shock-the-conscience. Additionally, the Supervisors specifically supported their opposition to the Plaintiff's Application and their decisions to appeal the case to both the Commonwealth Court and the Supreme Court, based upon the legitimate safety concerns for the Plaintiff and his family, the safety concerns for the rescue workers, and the potential polluting effect of the proposed on-site sewage system.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

*9 The Plaintiff's strongest arguments against Defendants are: (i) the Township delayed issuing a final building permit to the Plaintiff after the Pennsylvania Supreme Court denied allocatur; (ii) the dubious tactic of cashing Plaintiff's $2,300 permit fee before issuing any of the requested permits; and (iii) Edward Ford's conversation with Mr. Pushman that implied that the proposed Setback Ordinance was only intended to restrict Plaintiff from building on his Property. There is evidence suggesting that the Township purposefully delayed issuing the Plaintiff his final building permit *after* the Supreme Court denied allocatur. The Township claimed that the Plaintiff needed to surpass a few minor procedural hurdles, such as proof of workers' compensation insurance, completion of the Form, and redoing the water well test, before issuing the final building permit. We are not overly concerned with the need to complete these requirements before issuing the permits, rather we find it very curious that the Township did not bring these additional requirements to the Plaintiff's attention until late-January 2002, 15 months after the Supreme Court denied allocatur. This chain of events strongly points to a bad motive and purposeful intention to delay issuing the Plaintiff a final building permit, but it does not foster a finding that Defendants' behavior shocked-the-conscience. Similarly, cashing Plaintiff's $2,300 check is senseless and spiteful, but it does not necessarily point to shocking-the-conscience. Furthermore, Mr. Ford's secret-society badinage with Mr. Pushman is most worrisome and unprofessional and circumstantially points to improper motive, but nevertheless, improper motive is no longer the bar of culpability in land-use regulation substantive due process claims in this Circuit, and therefore Plaintiff's claim is without merit. We conclude that Plaintiff failed to establish that the totality of circumstances, compounding all of Defendants' questionable and unscrupulous behavior, amounted to shocking-the-conscience, and since we find that the Plaintiff was not deprived of any constitutional right, we will forego a superfluous analysis of the second prong of the Defendants' qualified immunity defense claim.

B. State Law Claims

*10 [4] Federal courts have discretion to exercise supplemental jurisdiction over state law claims if those claims arise from the same common nucleus of operative facts as the claim to which the federal court rightfully asserts original jurisdiction. 28 U.S.C. § 1367; *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Pryzbowski v. U.S. Healthcare, Inc.,* 245 F.3d 266, 275 (3d Cir.2000). Furthermore, a district court has discretion to "decline to exercise supplemental jurisdiction over a claim ... if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). However, in *Borough of W. Mifflin v. Lancaster,* the Third Circuit refined the nature of this discretion and held that, "[u]nder *Gibbs* jurisprudence, where the claim over which the district court has original jurisdiction is dismissed *before trial,* the district court *must* decline to decide the pendent state law claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." 45 F.3d 780, 788 (3d Cir.1995) (emphasis added). *See also Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1284 (3d Cir.1993).

Neither party has submitted any evidence suggesting that considerations of judicial economy, convenience, or fairness to the parties should prevent this Court from declining to hear the state law claims pursuant to 28 U.S.C. § 1367(c)(3) and *Lancaster.* However, none is needed. This case was commenced in the Eastern District of Pennsylvania over 40 months ago and this Court feels that it would be fundamentally unfair to the parties if we declined to hear the Plaintiff's state law claims. Accordingly, we exercise subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

1. Abuse of Process

[5] "The action for abuse of process ... lies where there has been a use of process for some collateral purpose and it is clear that the process must have been intentionally used for that wrongful purpose." *Psinakis v. Psinakis,* 221 F.2d 418, 423 (3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Cir.1955). Abuse of process is commonly characterized as a "perversion" of the legal process. *Id.* To establish an abuse of process claim plaintiff must show that the defendant: (i) used the legal process against the plaintiff; (ii) primarily for a purpose which the process was not designed; and (iii) plaintiff suffered harm. *Shiner v. Moriarty,* 706 A.2d 1228, 1236 (Pa.Super.1998). Plaintiff must show some "definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process ... and that there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* (quoting *Di Sante v. Russ Financial Co.,* 251 Pa.Super. 184, 380 A.2d 439, 441 (Pa.Super.1977) ). In *Al Hamilton Contracting Co. v. Cowder,* 434 Pa.Super. 491, 644 A.2d 188, 192 (Pa.Super.1994), the court noted that "it is not enough that the defendants had bad or malicious intentions or that the defendant acted from spite or with an ulterior motive," and "there must be an act or threat not authorized by the process, or the process must be used for an illegitimate aim such as extortion, blackmail, or to coerce or compel the plaintiff to take some collateral action."

There can be no argument that the Defendants used the legal process against the Plaintiff and as a result, the Plaintiff suffered harm. However, the Defendants did not use the legal process for some illegitimate aim resulting in a perversion of the legal process. The Defendants felt that the Court of Common Pleas misconstrued the MPC as it applied to the Plaintiff's Application and appealed the case to the Commonwealth Court. Similarly, when the Commonwealth Court affirmed the Court of Common Pleas, the Township chose to Petition for Allowance of Appeal to the Supreme Court of Pennsylvania, thereby exhausting its legal recourse in the Pennsylvania state courts. Until the final decision by the Supreme Court of Pennsylvania to deny allocatur, the Defendants were in line with the legitimate objectives of the legal process,[FN16] and there is no proof of an illegitimate aim such as "extortion, blackmail, or to coerce or compel the plaintiff to take some collateral action." *Id.* Furthermore, this Court finds it significant that *Plaintiff* initiated the underlying legal process and

that the Defendants only acted to appeal the trial court's decision, reversing the ZHB's holding, to the Commonwealth Court and Supreme Court of Pennsylvania. Of course, an appellant can be liable for abuse of process, but the Plaintiff will have a higher burden to overcome where the appellant is appealing a decision that was reversed by the trial court, because in this situation it is more likely that there could be a legitimate discrepancy in the interpretation or application of relevant law. Accordingly, we find that the Plaintiff's abuse of process claim is without merit.

> FN16. There is evidence that the Defendants delayed issuing Plaintiff's permits *after* the Supreme Court denied allocatur, however, at this point, this case no longer falls within the realm of abuse of process because the legal process has already run its course.

### 2. Civil Conspiracy

**\*11** **[6]** A claim for civil conspiracy has three essential elements: (i) two or more persons; (ii) combined or agreed; (iii) with the "intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 211, 412 A.2d 466, 472 (1979); *Scully v. U.S. WATS, Inc.,* 238 F.3d 497, 516 (3d Cir.2001). Furthermore, proof of malice is required in a successful civil conspiracy claim. *Thompson Coal,* 488 Pa. at 211, 412 A.2d 466; *Tyler v. O'Neill,* 994 F.Supp. 603, 612 (E.D.Pa.1998). It is also clear that "since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather it is a means for establishing vicarious liability for the underlying tort." *Beck v. Prupis,* 529 U.S. 494, 503, 120 S.Ct. 1608, 1615, 146 L.Ed.2d 561 (2000)(quoting *Halberstam v. Welch,* 705 F.2d 472, 479 (D.C.Cir.1983)); *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 407 (3d Cir.2000). *See also Allegheny General Hosp. v. Phillip Morris, Inc.,* 228 F.3d 429, 446 (3d Cir.2000)("aiding and abetting and civil conspiracy require an underlying tort cause of action."); *In re: Orthopedic Bone Screw Prods.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

193 F.3d 781, 789 (3d Cir.1999)("The established rule is that a cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability."). Civil conspiracy only acts as a mechanism for casting a wide net of liability on co-conspirators, who themselves may not have committed a tortious act. *Beck,* 529 U.S. at 494.

Plaintiff asserts that, "the indicia of a common plan to preserve open space in Upper Makefield Township establishes a conspiracy among the defendants." (P. Resp., at p. 113). However, as a prerequisite to civil conspiracy liability, the Plaintiff must prove that the Defendants have some underlying tort liability, and since we dismissed all other counts against the Defendants, then as a matter of law, they cannot be held liable for civil conspiracy. *See In re: Orthopedic Bone Screw Prods.,* 193 F.3d at 789. *See also Jones v. Johnson & Johnson,* 1997 WL 549995, at *13 (E.D.Pa.1997) (plaintiff's civil conspiracy to defame claim must fail since the underlying defamation claim was insufficient); *Pelagatti v. Cohen,* 370 Pa.Super. 422, 536 A.2d 1337, 1342 (Pa.Super.Ct.1987)(" absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy." ). Accordingly, we find that Plaintiff's civil conspiracy claim is without merit.

### IV. *CONCLUSION*

**\*12** Based on the foregoing reasons, Defendants' Motion for Summary Judgment is granted. An order has been issued.

### *ORDER*

AND NOW, this day of February, 2003 upon consideration of (i) Defendants' Motion for Summary Judgment (Document No. 51, filed March 29, 2002); (ii) Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Document No. 53, filed April 12, 2002); (iii) Defendants' Reply in Support of Defendants' Motion for Summary Judgment (Document No. 54, filed April 26, 2002); (iv) Plaintiff's Supplemental Memorandum of Law in Opposition to Defendants'

Motion for Summary Judgment (Document No. 59, filed February 10, 2003); and (v) Defendants' Supplemental Memorandum of Law in Support of their Motion for Summary Judgment (Document No. 60, filed February 10, 2003), it is hereby ORDERED that Defendants' Motion for Summary Judgment is GRANTED. This is a final legal judgment and the Clerk of Court is directed to statistically close this matter.

E.D.Pa.,2003.
Levin v. Upper Makefield Tp.
Not Reported in F.Supp.2d, 2003 WL 21652301 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.